# UNITED STATES OF AMERICA *v.* JOSE JUAN LUCERO.

PUEBLO INDIANS, RIGHTS OF, AS CITIZENS.—The pueblo Indians of New Mexico were, at the date of the treaty of Guadalupe Hidalgo, citizens of the Mexican republic, and by virtue of the provisions of that treaty became citizens of the United States, none of them having elected to retain the character of Mexican citizens. Their property rights are therefore guaranteed by the treaty equally with those of other Mexican citizens of the territory.

PUEBLO INDIANS NOT SUBJECT TO INTERCOURSE ACT OF 1834.—The pueblo Indians of New Mexico are not within the provisions of the intercourse act of 1834, not being tribal Indians, and are not subject to the jurisdiction of the Indian department of the United States government.

JUDICIAL NOTICE OF STATUS OF PUEBLO INDIANS.—The court will take judicial notice of the history and status of the pueblo Indians, and of the title by which they hold their lands.

TITLE TO PUEBLO LANDS.—The pueblo of Cochiti, and other pueblos of New Mexico, had an indefeasible title to their lands at the date of the treaty of Guadalupe Hidalgo, and that title is guaranteed by the treaty and has been confirmed by congressional legislation.

No PENALTY RECOVERABLE FOR SETTLEMENT ON PUEBLO LANDS.—The penalty prescribed by the eleventh section of the intercourse act of 1834 is not recoverable against one settling on land belonging to a pueblo, and particularly to the pueblo of Cochiti, that pueblo being a body corporate and having a complete title to its lands, which it can assert and protect in the courts in the same way as other land-owners.

CONSTRUCTION OF PENAL STATUTES.—Statutes for the regulation of trade and intercourse which impose fines and forfeitures are to be construed strictly as penal laws.

AVERMENT IN ACTION TO RECOVER PENALTY UNDER INTERCOURSE ACT.—In an action to recover a penalty under the eleventh section of the intercourse act of 1834 for settling on Indian lands, the declaration must aver that the land settled on belonged to the Indians "by treaty with the United States," or it will be bad on demurrer.

MISDESCRIPTION OF THE LAND AS TO OWNERSHIP IN SUCH CASE.—A misdescription of the land in such a case, with respect to the parties to whom it is alleged to belong, will be fatal.

ALLEGATION THAT SETTLEMENT WAS "UNLAWFUL," NECESSARY.—An averment that the settlement was "unlawful" or "wrongful" is necessary in such an action.

ERROR to the first judicial district, Santa Ana county, in an action of debt on a statute. The opinion states the case.

*S. B. Elkins,* for the plaintiff in error.

*M. Ashurst and Kirby Benedict,* for the defendant in error.

By Court, WATTS, C. J:

On the thirteenth day of July, 1867, the United States, by S. B. Elkins, her attorney, instituted a suit in the first judicial district court, for the territory of New Mexico, Santa Ana county, against Jose Juan Lucero, a resident of Santa Ana county, New Mexico, said county being within the tenth judicial district for the territory of New Mexico.

This suit is an action of debt on statute, and the statute upon which it is founded will be found in vol. 4, Statutes at Large, page 730, section 11, and reads as follows, to wit:

" Section 11. And be it further enacted, that if any person shall make a settlement on any lands belonging, secured, or granted by treaty with the United States, to any Indian tribe, or shall survey, or attempt to survey, such lands, or designate the boundaries by marking trees or otherwise,

such offender shall forfeit and pay the sum of one thousand dollars. And it shall, moreover, be lawful for the president of the United States to take such measures and employ such military force as he may judge necessary, to remove from the land as aforesaid any such person as aforesaid."

It will not be forgotten that the intercourse act, which contains this penal section, was passed on June 30, 1834. The petition in this case charges the defendant, Lucero, with having entered upon lands belonging to the pueblo tribe of Indians, of the pueblo of Cochiti, and then sets out the boundaries of the land upon which Lucero settled, belonging to the said pueblo tribe of Indians, of the pueblo of Cochiti aforesaid, secured to them by patent from the United States. To this petition the defendant, Lucero, put in a general demurrer, to which the United States filed her joinder in demurrer, and at the July term of the United States district court, for the first judicial district of the territory of New Mexico, the cause was heard on demurrer, fully argued by counsel, and duly considered by the court, and the demurrer was sustained.

The United States declined to amend her petition, and judgment was rendered on the demurrer, that the said plaintiff be barred from further having or maintaining her aforesaid action against the said defendant, and that the costs be taxed against the United States. The United States now bring this case into this court by writ of error, and the only question of error made in this case is, that the demurrer to the petition was sustained by the court below, when it should have been overruled. This settlement of Lucero is alleged in the petition to have been made on the first day of January, 1866. Febuary 27, 1851, congress passed an act, the seventh section of which was as follows:

"Section 7. And be it further enacted, that all the laws now in force regulating trade and intercourse with the Indian tribes, or such provisions of the same as may be applicable, shall be and the same are hereby extended over the Indian tribes of New Mexico and Utah:" See 9 Stat. at Large, 587.

A careful consideration of this act thus extending over New Mexico, the acts and all the acts regulating trade and intercourse, will satisfy the most incredulous, that, in the opinion of congress, some of these acts were, in some of their provisions, unsuited to be extended over all classes of people in New Mexico called Indians. The question now presents itself: Is there a class of Indians in New Mexico who do not come within the letter or spirit of said acts, and who are not operated upon by said acts, unless specially named and designated by congress as being within the provisions of those acts? When the intercourse act of June 30, 1834, was passed, and for ten years thereafter, New Mexico constituted a part of the republic of Mexico, and within the extended jurisdiction of the United States there existed no class of Indians called pueblo or town Indians. The term pueblo Indian is a term used to separate and distinguish them from the general class of Indians, such as existed within the United States in 1834; no such Indians then existed within the limits of the United States, and the law then passed could not have been intended to operate upon or affect a class of Indians differing widely from the Indians of the United States in their habits, manners, and customs. Who and what are the Indians for whom said laws were passed, and upon whom they were intended to operate? They were wandering savages, given to murder, robbery, and theft, living on the game of the mountains, the forest, and the plains, unaccustomed to the cultivation of the soil, and unwilling to follow the pursuits of civilized man. Providence made this world for the use of the man who had the energy and industry to pull off his coat, and roll up his sleeves, and go to work on the land, cut down the trees, grub up the brush and briers, and stay there on it and work it for the support of himself and family, and a kind and thoughtful Providence did not charge man a single cent for the whole world made for mankind and intended for their benefit. Did the Indians ever purchase the land, or pay any one a single cent for it? Have they any deed or patent for it, or has it been devised to them by any one as their exclusive inheritance?

Land was intended and designed by Providence for the

use of mankind, and the game that it produced was intended
for those too lazy and indolent to cultivate the soil, and the
soil was intended for the use and benefit of that honest man
who had the fortitude and industry to reclaim it from its
wild, barren, and desolate condition, and make it bloom
with the products of an enlightened civilization.   The idea
that a handful of wild, half-naked, thieving, plundering,
murdering savages should be dignified with the sovereign
attributes of nations, enter into solemn treaties, and claim
a country five hundred miles wide by one thousand miles
long as theirs in fee simple, because they hunted buffalo
and antelope over it, might do for beautiful reading in
Cooper's novels or Longfellow's Hiawatha, but is unsuited
to the intelligence and justice of this age, or the natural
rights of mankind.   The government of the United States,
while thus dignifying these savages with the title of *quasi*
nations, with whom the United States has, from time to
time, and quite often, entered into stipulations to purchase
their lands, have generally purchased at an average of about
two cents an acre, and then sold it out to the people at from
one dollar and a quarter to ten dollars and fifty cents per
acre, thus making a speculation off of the Indian lands of
over fifty millions of dollars, if their title is anything but
an ingenious and benevolent fiction.   This property of over
fifty millions of dollars, the treaties with the Indian tribes
and sales of public lands to the people will demonstrate.
Let us now look at the pueblo Indians of New Mexico, and
see if there is anything in their past history or present con-
dition which renders applicable to them a set of laws de-
signed and intended to regulate the trade and intercourse
of civilized man with wandering tribes of savages.   Colum-
bus, the daring hero of the seas, discovered America in 1492.
December 11, 1620, the pilgrim fathers landed on a granite
bowlder lying on the shore of Plymouth bay, in the new
world.   Now, it is worth while to know, that in 1530, ninety
years before that event, Alsar Nunie Cohega de Baca,
Alonzo del Castillo, Alejandro Andres Dorantes, and Este-
fana, a blackamoor, passed from the gulf of Mexico through
Louisiana and Texas into New Mexico; spent several years

in this valley of the Rio Grande, visiting the various villages of pueblo Indians in New Mexico during the year 1534, and passing south-west in May, 1536, and near the Pacific ocean, at the village of San Miguel, in Sonora, and finally reached the City of Mexico, after seven years' wandering in the wilderness. Our timid forefathers, who peeped out into the wilderness from their colony of Plymouth, are not to be compared to the true Spanish adventurers who planted the cross of civilization two thousand miles distant, in the valley of the Rio Grande, ninety years prior to their arrival in the new world.

The theory, promulgated by some, and believed by many, that the Spanish adventurers found the pueblo Indians of New Mexico a wild, savage, and barbarous race; that they conquered them, and reduced them to subjection, placed them in villages, and taught them the arts of civilized life, is a pure and unadulterated fiction, and contradicted by the uniform history of the Spanish adventurers for over two hundred years. They found the pueblo Indians, on their advent into New Mexico, a peaceful, quiet, and industrious people, residing in villages for their protection against the wild Indians, and living by the cultivation of the soil. Their villages are described, their locality mentioned, their habits and pursuits delineated, and we learn that the old palace, not one hundred feet from where we are now holding court, was built upon the site of one of their ancient towns. That the Spanish placed them under subjection, treated them with cruelty, but planted the Catholic religion among them, and an improved civilization, is true; but they found them civilized, peaceful, and kind, and on that account they became an easy victim of their cupidity and despotic rule. This condition of domineering on the part of the Spaniards, and meek obedience on the part of the pueblo Indians, continued until 1670, when the pueblo Indians rebelled against their Spanish masters, and expelled them all from New Mexico. It was not until 1688, that the Spaniards obtained sufficient force to conquer, subdue, and chastise them. At the date of 1689, and within a few years subsequent, was executed to

the various pueblos of New Mexico their titles to their lands. The Spaniards acknowledged their title to the land on which they were residing, and had resided time whereof the memory of man runneth not to the contrary, and a written agreement was executed and delivered to them; and so long as the Spanish rule was continued in America, these titles were respected. Upon the establishment of the independence of Mexico from old Spain, these titles continued to be respected, and the government of the United States in the treaty of Guadalupe Hidalgo pledged her faith as a nation to maintain and respect them. When the republic of Mexico was compelled by the chances of unsuccessful war to part with a portion of her territory and people, she threw around them by treaty all the safeguards to their civil, religious, and political rights arising out of honor among men and faith among nations.

In the treaty of Guadalupe Hidalgo, signed on the second of February, 1848, ratified on the twelfth of March, 1848, exchanged at Queretaro the thirtieth of May, 1848, and proclaimed the fourth of July, 1848, ample protection is promised and pledged to the people of New Mexico, and expressly stipulated in the treaty itself, and particularly in the eighth and ninth articles of said treaty. "The citizens of New Mexico can remain in New Mexico or remove to Mexico," and whether they go or stay, it is expressly stipulated that they have the right of "removing the property which they possess in said territory, or disposing thereof and removing the proceeds wherever they please without their being subjected on this account to any contribution, tax, or charge whatever." It was further provided in the said treaty, that property of every kind now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of those, and all Mexicans who may acquire said property by contract, shall enjoy with respect to it, guaranties equally ample as if the same belonged to citizens of the United States. In the ninth article it is provided, that "Mexicans, who in the territories aforesaid, shall not preserve the character of citizens of the Mexican republic, conformably with

what is stipulated in the preceding article, should be incorporated into the union of the United States, and be admitted at the proper time (to be judged by the congress of the United States), to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution, and in the mean time shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion, without restriction:" See 9 Statutes at Large, 927, 928.    Under this treaty the pueblos could have sold out and gone to Mexico.    But if such protection had not been especially stipulated in that treaty, still the right of the people to have their title to their property recognized and confirmed by the new sovereign is plain and obvious.    The supreme court has forever settled it to be the law of nations, of justice, and of right, that by conquest and annexation, the allegiance of the people is transferred from one sovereign to another, but the rights of the people to their property remain undisturbed, and their relations to each other: See *United States* v. *Percheman,* 7 Pet. 51.    In the case of *The United States* v. *Arredondo,* 6 Id. 691, it was decided by the supreme court, that congress has adopted as the basis of all their acts the principle that the law of the province in which the land is situated is the law which gives efficacy to the grant and by which it is to be tested, whether it was property at the time the treaties took effect.

Let us now pass to the consideration of the status of the Indian pueblo of Cochiti and its people as to the republic of Mexico, and the title by which they held their land at the date of said treaty in 1848, when they passed out of the sovereignty of the republic of Mexico, and came under the sovereignty of the United States.    Were the pueblo Indians of New Mexico, at the date of the treaty of Guadalupe Hidalgo, citizens of the republic of Mexico, and as such entitled to all the protection and benefit of all articles in said treaty, made for the protection of the Mexicans ?

1. What was the relation of the pueblo Indians of New Mexico to the republic of Mexico prior to the treaty of Guadalupe Hidalgo as to citizenship ?

In considering this question, it is is worth while to notice that after the conquest of the city of Mexico by Cortez in 1521, the Spanish viceroys in Mexico assumed and exercised all the privileges of royalty. He was commander-in-chief of the troops, and filled up all vacancies; judgments and decrees bear his signature, and from his decision there was no appeal or writ of error. In everything but name he was a despotic sovereign. Cortez, with his handful of Spaniards, was joined by one hundred and fifty thousand Indian allies, and the great multitude of people found by him in the valley of Mexico, numbering several millions, lived in towns, cultivated the soil, and irrigated the country by means of extensive ditches and canals, and were called Indians, and it will be found that at as late a date as 1851, the population of this republic of Mexico consisted of one million of whites, four millions of Indians, and six thousand negroes. The Spanish rule in Mexico was partial and unjust. Its few favorites of the Spanish crown held all the offices in church and state, made the laws, executed the laws, and considered the great body of the Mexican people, equally honest and more industrious than themselves, a sort of upper servants and peons to the wants of their whiter skin and more refined civilization. The Indians and Mexicans rebelled against such tyranny and injustice, and under the leadership of Iturbide, struck for independence and successfully maintained it. The Indians, as they were called of Mexico on account of their numbers, their courage, their patriotism, rendered easy the overthrow of the unjust, arbitrary, and partial rule of the viceroys of Spain, and they established upon its ruins the empire under Iturbide, their successful leader. The Spanish scholar will not fail to remember that when Spanish law books and Spanish legislators speak of Indians, they mean that civilized race of people who live in towns and cultivate the soil, and are often mentioned as *naturales* and *pueblos,* natives of the towns, and as *Indios del pueblos,* Indians of the towns; and for the other distinct and separate class of Indians whose daily occupation was war, robbery, and theft carried on against the pueblo Indians, as well as the Spaniards, the term

savages (*salvajes*) or barbarous Indians (*Indios barbaros*), was the expression used.

An examination of the eleventh article of the treaty of Guadalupe Hidalgo will demonstrate, that in speaking of the Indians, no reference was had, or intended to be had, to the pueblo Indians, for the term is *tribus salvajes* (savage tribes). When the term Indian is used in our acts of congress, it means that savage and roaming race of red men given to war and the chase for a living, and wholly ignorant of the pursuits of civilized man, for the simple reason that when those laws had been enacted, no such class of Indians as the pueblo Indians of New Mexico existed within the existing limits of the United States.

Neither the Spanish crown, its viceroys in the new world, nor the Mexican republic ever legislated for the savage class of Indians. They would as soon have thought of legislating upon what time the wolf should be admitted into their sheep-fold, the bear into their cornfields, the fox into their hen-roosts, or the skunk into their parlors. The revolutionary government of Mexico, on the twenty-fourth day of February, 1821, adopted what is called the plan of Iguala, a short time previous to the subversion of the Spanish power in New Spain, and by that plan it is declared "that all the inhabitants of New Spain, without distinction, whether Europeans, Africans, or Indians, are citizens of this monarchy, with a right to be employed in any post, according to their merit and virtues." On the twenty-fourth day of August, 1821, the independence of New Spain was for the time established by the treaty of Cordova, made between the Spanish viceroy and the revolutionists, and in this treaty the principles of the plan of Iguala were fully recognized and affirmed. On the twenty-eighth of September, 1821, the declaration of independence was issued, and that declaration asserts and reaffirms the principles of the plan of Iguala. The Mexican congress, shortly after their first organization, passed two acts upon this subject, the first on the twenty-fourth of February, 1822, and the second on the ninth of April, 1823. By the act of the twenty-fourth of February, 1822, the sovereign congress declared "the

equality of civil rights to all the free inhabitants of the empire, whatsoever may be their origin in the four quarters of the earth." The act of the ninth of April, 1823, reaffirms the three guarantees of the plan of Iguala: 1. Independence of New Spain; 2. The perpetuity of the Catholic religion; and 3. The union of all Mexicans, of whatever race. It will thus be seen that the Indian race of Mexico, and that portion, and a vast portion, of the inhabitants to whom that term was properly applicable, were recognized as citizens of the republic of Mexico, in all her plans of government and acts of solemn obligation putting into practical operation that plan. Now, if there is no law of the republic of Mexico (and we are unable to find any) taking away the right of citizenship with which the Indian race was invested as far back as the twenty-fourth of February, 1821, the conclusion is forced upon us, that they (the Indian race) were in fact Mexican citizens at the date of the treaty of Guadalupe Hidalgo, and are entitled to the benefit of all the articles in said treaty designed to protect the life, religion, and property of Mexicans under the new sovereign, in whose hands the destinies of war had placed them.

If the republic of Mexico has never passed any act taking away from the Indians their rights of citizenship, it must be evident that at the date of the treaty of Guadalupe Hidalgo the Indian race, in the Spanish sense of the term, were as much and fully citizens of the republic of Mexico as Europeans or Africans. On the seventeenth of September, 1822, the Mexican congress passed a preamble and act carrying into effect these fundamental principles of 'the new government, as follows: " The sovereign Mexican constitutional congress, with a view to give due effect to the twelfth article of the plan of Iguala, as being one of those which form the social basis of the edifice of our independence, has determined to decree and does decree: Article 1. That in any register, and public and private documents, on entering the name of citizens of this empire, classification of them with regard to their origin shall be omitted." This view of this question is not original with us. In the December term of the supreme court, 1854, this point was before the

supreme court of the United States, and by the carefully
considered opinion of the court, by Justice Nelson, in the
case of *The United States* v. *Ritchie,* 17 How. 525, this iden-
tical question was finally settled, so far as human reason
and the able opinion of the highest judicial tribunal in the
land was capable of settling anything. It was supposed
that the opinion in that case had closed this controversy,
but the inevitable and infallible Indian, however, never
rests satisfied with acts of congress or decisions of its
courts when not responsive to his plans of patronage and
plunder, and always invents some plausible excuse to disre-
gard or evade them. Justice Nelson, after reciting the plan
of Iguala and acts of congress above cited, says: "The
Indian race having participated largely in the struggles re-
sulting in the overthrow of the Spanish power and in the
erection of an independent government, it was natural that,
in laying the foundations of the government, the previous
political and social distinction in favor of the European or
Spanish blood should be abolished and the equality of
rights and privileges established. Hence the article to this
effect in the plan of Iguala and the decree of the first con-
gress declaring the equality of civil rights, whatever may
be their race or country. These solemn declarations of the
political power of the government had the effect necessarily
to invest the Indians with the privileges of citizenship as
effectually as had the declaration of independence of the
United States of 1776, to invest all those persons with these
privileges residing in the country at the time, and who
adhered to the interest of the colonies." The learned judge,
in his able exposition of the law on this point, proceeds to
say, that "the improvement of the Indians under the in-
fluence of the missionary establishments in New Spain,
which had been specially encouraged and protected by the
mother country, had doubtless qualified them, in a measure,
for the enjoyment of the benefits of the new institutions.
In some parts of the country very considerable advance-
ment had been made in civilizing and christianizing the race.
From their degraded condition, however, and ignorance
generally, the privileges extended to them in the admin-

istration of the government must have been limited, and they still doubtless required its fostering care and protection. But as a race, we think it impossible to deny that, under the constitution and laws of the country, no distinction was made as to the rights of citizenship and the privileges belonging to it, between this and European or Spanish blood. Equality between them, as we have seen, has been repeatedly affirmed in the most solemn acts of the government. Solano, the grantee in this case, was a civilized Indian; was a principal chief of his race on the frontiers of California; held a captain's commission in the Mexican army, and is spoken of by the witnesses as a true and meritorious officer. Our conclusion is that he was one of the citizens of the Mexican government at the time of the grant to him, and that, as such, he was competent to take, hold, and convey real property the same as any other citizen of the republic."

It is true that in the close of the opinion the judge said: "It is conceded that the lands in question do not belong to the class called pueblo lands, in respect to which we do not intend to express any opinion, either as to the power of the authorities to grant, or the Indians to convey." This remark does not lessen the value of the opinion upon the subject of citizenship, nor destroy its applicability when the stronger claim and better rights of the pueblo Indians shall come under review, as to their right to citizenship, or to hold, purchase, or convey property as citizens and as men, without having to ask the sanction of any department of the government. The pueblo Indians of New Mexico thus being, at the date of the treaty of Guadalupe Hidalgo, Mexican citizens, they were, by the sixth article of that treaty, made citizens of the United States, inasmuch as not one of them elected " to retain the title and rights of Mexican citizens, but acquired under that treaty those of citizens of the United States." This brings us to the consideration of the second proposition, which is this: If the pueblo Indians were citizens of the republic of Mexico at the date of the treaty of Guadalupe Hidalgo, and by the operation of that treaty became citizens of the United

States, had congress the right to deprive them of rights guaranteed to them by solemn treaty, and reduce them to the condition of wards of the government, to be placed under the management of an agent of the Indian department, their lands held subject to the will of the government, and they made to go here or there, as the fancy. or interest of the government shall dictate?

Before approaching the discussion of this point, it is proper to cite what has been the legislation of congress upon the subject of, not Indians in general, but the pueblo Indians ·of New Mexico generally, and of this particular pueblo of Cochiti brought to the notice of the court by petition in this case. The first mention or allusion made in any act of congress of the "pueblos" of New Mexico, will be found in the act "To establish the offices of surveyor-general of New Mexico, Kansas, and Nebraska, to grant donations to actual settlers therein, and for other purposes:" 10 Stat. at Large, 308. In the eighth section of that act, among other duties intrusted to the surveyor-general of New Mexico, it is provided that he "shall also make a report in regard to all pueblos existing in the territory, showing the extent and locality of each, stating the number of inhabitants in the said pueblos respectively, and the nature of their title to the land; such report to be made according to the form which may be furnished by the secretary of the interior; which report shall be laid before congress for such action therein as may be deemed just and proper, with a view to confirm *bóna fide* grants, and give full effect to the treaty of 1848, between the United States and Mexico."

Under the authority of this act, the surveyor-general of New Mexico examined and reported upon the titles of the pueblos of New Mexico. He found twenty-one pueblos in all, with an aggregate population of about eight thousand persons, and reported the titles of seventeen pueblos for confirmation as *bona fide* titles; and on December 22, 1858, congress confirmed them, directing their survey, and that a patent issue, and to the confirmation of these grants or titles, there was added the following proviso:

"Provided, that this confirmation shall only be construed as a relinquishment of all title and claim of the United States, to any of said lands, and shall not affect any adverse valid rights, should such exist:" See 11 Stat. at Large, 374. In 1857, congress appropriated three thousand seven hundred and fifty dollars, for the survey of Indian pueblos in New Mexico: See Id. 184. In 1854, congress appropriated, " for the expenses of making presents of agricultural implements and farming utensils, to the bands of pueblo Indians in the territory of New Mexico, ten thousand dollars:" See 10 Id. 330. When appropriations were asked for the Indians proper, or uncivilized Indians, a very different form of estimate and appropriation took place. The appropriations ran thus: " For general incidental expenses of the Indian service in the territory of New Mexico, and in making to the Indians in said territory, presents of goods, agricultural implements, and other useful articles, and in assisting them to locate in permanent abodes and sustain themselves by the pursuits of civilized life, to be expended under the direction of the secretary of the interior, forty-seven thousand five hundred dollars:" See 11 Id. 79.

It must be manifest to all that the appropriations asked for and granted to enable the Indian department " to locate in permanent abodes " the pueblo Indians of New Mexico, who had been so located in permanent abodes, and supporting themselves by the pursuits of civilized life, was never dreamed of by congress in making these annual appropriations for a long series of years." Let us now see what has been the legislation of congress with regard to agents for the Indians of New Mexico. It will appear by reference to 9 Stat. at Large, p. 587, sec. 5, that four agents for Indians in New Mexico were authorized to be appointed, and when so appointed to be assigned to duty by the superintendent of Indian affairs for New Mexico. This act was passed February 27, 1851, and the seventh section extends such of the provisions of the intercourse act as are applicable over New Mexico. An additional agent for New Mexico was authorized by act of congress in 1854: See 10 Id., p. 332, sec. 6 [5]. In vol. 11, Id. 169, an additional agent for the Indi-

ans in New Mexico was authorized. In vol. 12, Id. 113, an additional agent was authorized by congress for the Indians in New Mexico. In vol. 13, Id. 323, it will be found that congress abolished the southern Apache agency. In all the legislation of congress upon the subject of the Indians of New Mexico, the pueblo Indians have been mentioned but four times: first, in the act of July 22, 1854, regarding their titles to be investigated and reported upon, they are called "pueblos;" in the act of July 31, regarding their lands to be surveyed, they are called "Indian pueblos;" in the act of July 31, 1854, when ten thousand dollars is given them, they are called "pueblo Indians in the territory of New Mexico;" in the act of December 22, 1858, confirming the lands to the pueblo of Cochiti, in the county of Santa Ana, the word "Indian" can not be found anywhere in the act. In the same act it will be seen that in confirming other village titles, congress does not say the pueblo of Tecolote, the pueblo of Chillili, and the pueblo of Belen, but the word "town" is substituted instead of the word "pueblo." If these pueblos, twenty-one in number, were really included in the provisions of the intercourse act, intended for a different class of Indians, the Indian department, during the last twenty years that they have been under their pretended control, would have had spread upon our statutes at large certainly not less than eighty treaties with these twenty-one *quasi* nations. How has it been with the Navajos, a single tribe in New Mexico? November 22, 1846, Colonel Doniphan made a treaty with them: See Doniphan's Expedition, 188. May 20, 1848, Colonel Newby made a treaty with them: See Santa Fe Republican, June 17, 1848. September 9, 1849, Colonel Washington made a treaty with them: See 9 Stat. at Large, 974, 975. And the court now has before it another treaty with the Navajos, not yet in the Statutes at Large, dated June 1, 1868, ratified July 25, 1868, and proclaimed August 12, 1868, and which last treaty the official report of United States army officers, on file at the military headquarters of this district, show to have been violated by theft and robbery of the people of New Mexico, in less than twenty days after it was signed.

Here we have with a single tribe of Indians in New Mexico four solemn treaties made by the high plenipotentaries on the part of the United States of America (*E pluribus unum*), with the high chiefs and council of the great Navajo nation, all of whom, except Delgado, sign the solemn document with a neat and beautiful "his × mark." What a beautiful field for Indian agents, if the intercourse act is applied to these twenty-one pueblos located two hundred and fifty miles up and down the valley of the Rio Grande, all separate and distinct nationalities living in our midst, cultivating the soil, raising a large supply of wheat, corn, apples, peaches, plums, and melons in the fields and gardens, and only to think that they have been doing this for the last three hundred years without a treaty! It will thus be seen by a reference to the acts of congress above cited, that no person has ever been authorized by congress to be appointed agent for the pueblo Indians, nor has any one ever been commissioned as agent for them, and the designation of an agent for the pueblos by the Indian department is without any authority of congress or the decision of any judicial tribunal authorized to pass upon the question, and the transfer of eight thousand of the most honest, industrious, and law-abiding citizens of New Mexico to the provisions of a code of laws made for savages, by the simple stroke of the pen of an Indian commissioner, will never be assented to by congress or the judicial tribunals of the country so long as solemn treaties and human laws afford any protection to the liberty and property of the citizens. Let us now look at the history of territorial legislation with regard to the pueblo Indians of New Mexico. General Kearny, after taking possession of New Mexico, eighteenth of August, 1846, established a system of civil government in New Mexico, organized courts, appointed judges, and convened a legislative body, and in December, 1847, that legislative assembly passed the following act:

"INDIANS.

"Section 1. That the inhabitants within the territory of New Mexico, known by the name of pueblo Indians, and living in towns or villages built on lands granted to such

Indians by the laws of Spain and Mexico, and conceding to such inhabitants certain lands and privileges to be used for the common benefit, are severally hereby created and constituted bodies politic and corporate, and shall be known in the law by the name of the pueblo de ———— (naming it) and by that name they and their successors shall have perpetual succession, sue and be sued, plead and be impleaded, bring and defend in any court of law or equity all such actions, pleas, and matters whatsoever proper to recover, protect, reclaim, demand, or assert the right of such inhabitants, or any individual thereof, to any lands, tenements, or hereditaments possessed, occupied, or claimed, contrary to law, by any person whatever, and to bring and defend all such actions, and to resist any encroachment, claim or trespass made upon such lands, tenements, or hereditaments belonging to said inhabitants, or any individual:" See Compiled Laws of New Mexico, 470.

On the tenth of January, 1853, a law was passed, prohibiting the sale of liquor to Indians, with a proviso, "that the pueblo Indians that live among us are not included in the word Indian:" See Compiled Laws, p. 472, sec. 5. January 21, 1861, an act was passed, requiring the pueblos of Indians to work *acequias* (ditches) and highways, and extending the act of January 13, 1860, over the pueblo Indians as to trespasses of their stock on the fields of their neighbors: See Id. 470, 471. On the sixteenth of February, 1854, the legislative assembly of New Mexico passed the following act, section 70: "That the pueblo Indians of this territory for the present, and until they shall be declared by the congress of the United States to have the right, are excluded from the privilege of voting at the popular elections of the territory, except in the elections for overseers of ditches to which they belong, and in the elections proper to their own pueblos to elect their officers according to their ancient customs." The seventh section of the organic act of September 9, 1850, invests the legislative assembly of New Mexico with the power to legislate upon all rightful subjects of legislation consistent with the constitution of the United States and the provisions of that act, and further provided that

"all laws passed by the legislative assembly and governor, shall be submitted to the congress of the United States, and if disapproved, shall be null and of no effect."

As this act of the sixteenth of February, 1854, passed by the legislative assembly of New Mexico, has never been disapproved by congress, it must be regarded as in force in New Mexico, and deprives the pueblo Indians of one of the dearest and most valued rights, the right to be heard by their ballots in the selection of agents to make laws for their government.

Let us now consider the stipulations of the eighth and ninth articles of the treaty of Guadalupe Hidalgo. That article gives the Mexicans established in New Mexico the right to retain the title and rights of Mexican citizens, or acquire those of citizens of the United States, and the election was required to be made within one year after the exchange of ratifications of that treaty. Colonel Washington made proclamation requiring the people to elect by signing a declaration before the clerk of the courts in the different districts, if they wished to retain the title and rights of Mexican citizens. In that test, which is a public printed document, the name is not found of a single pueblo Indian; and hence, by the express terms of the eighth article of the treaty, they became citizens of the United States, as they were previously citizens of the Mexican republic. The ninth article provides "that Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican republic, conformably with what is stipulated in the preceding article, shall be incorporated into the union of the United States, and be admitted at the proper time (to be judged of by the congress of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution, and in the mean time shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction." Whether the right to vote shall be given to the African or taken away from him; given to the Mexican or taken away from him; given to the American or taken

away from him; given to the pueblo Indian or taken away from him; are questions not properly before us, and are to be judged of by the congress of the United States. It is to be presumed that congress has the right, if congress thinks proper to exercise it, to repeal the organic act, disfranchise all the citizens, and legislate hereby directly for this territory without the aid of the legislative assembly; and whether political rights are given or withheld by congress, is no business of ours; but it is the right and duty of the courts to see that every citizen of the territory of New Mexico, in conformity with the ninth article of the treaty of Guadalupe Hidalgo, "shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction."

This court, under this section of the treaty of Guadalupe Hidalgo, does not consider it proper to assent to the withdrawal of eight thousand citizens of New Mexico from the operation of the laws, made to secure and maintain them in their liberty and property, and consign their liberty and property to a system of laws and trade made for wandering savages and administered by the agents of the Indian department. If such a destiny is in store for a large number of the most law-abiding, sober, and industrious people of New Mexico, it must be the result of the direct legislation of congress or the mandate of the supreme court. This court feels itself incompetent to construe them into any such condition. This court has known the conduct and habits of these Indians for eighteen or twenty years, and we say, without the fear of successful contradiction, that you may pick out one thousand of the best Americans in New Mexico, and one thousand of the best Mexicans in New Mexico, and one thousand of the worst pueblo Indians, and there will be found less, vastly less, murder, robbery, theft, or other crimes among the thousand of the worst pueblo Indians than among the thousand of the best Mexicans or Americans in New Mexico. The associate justice now beside me, Hon. Joab Houghton, has been judge and lawyer in this territory for over twenty years, and the chief justice for over

seventeen years, and during all that time not twenty pueblo Indians have been brought before the courts in all New Mexico, accused of violation of the criminal laws of this territory. For the Indian department to insist, as they have done for the last fifteen years, upon the reduction of these citizens to a state of vassalage, under the Indian intercourse act, is passing strange. A law made for wild, wandering savages, to be extended over a people living for three centuries in fenced abodes and cultivating the soil for the maintenance of themselves and families, and giving an example of virtue, honesty, and industry to their more civilized neighbors, in this enlightened age of progress and proper understanding of the civil rights of man, is considered by this court as wholly inapplicable to the pueblo Indians of New Mexico.

What is the true character of all the tribes of wild and roaming Indians west of the Mississippi, and what has it been for over seventy years last past? Take the expedition of Lewis and Clark, from the Mississippi to the Pacific ocean in 1804, and the expedition of Lieutenant Pike in 1806, to the Rocky mountains, and then take the vast multitude of reports resting in the pigeon-holes of the Indian department, upon the subject of the thefts, murders, and robberies of the Indians, which have never seen the light, and never will, if that department can prevent it, and it will be found that not a single tribe, beyond the Mississippi, of wild Indians can be found whose constant habit is not to steal, rob, and murder the white man, and to war against their own neighboring tribes and plunder one another, whenever a suitable occasion presents itself. This utopian idea, that kind treatment and a few agents and missionaries can civilize and christianize these wicked and wild savages in a few years, is a sad and fatal delusion. When you can tame a million wild buffalos by sending a yoke of oxen among them; when a single tame pony let loose among a herd of wild horses will reduce them to subjection; or when you can clear the muddy waters of the great Mississippi by running a spring branch into it, then, and not till then, will you accomplish these utopian schemes of elevation and

civilization.   Experience has proved that these agents and missionaries will descend to the habits and customs of the Indian, instead of elevating the Indian to the habits and customs of civilized life.   Indians, in their nature and habits, are like other animals.   The horse, the cow, the sheep, the chicken, can be tamed and made useful.   The tiger, the bear, the panther, and wildcat can not be tamed or reduced to subjection, except by commencing when young, and bestowing years of labor in the undertaking.   It is the same with Indians.   Some tribes can easily and readily adopt the pursuits and habits of civilized life; but in other tribes, the civilization of those of mature age is impossible; and even when taken young, civilization is rarely accomplished under half a century.   To extend over all the same system of laws is the height of folly and injustice.

In the argument of this case, it is contended, by the attorney for the United States, that this question has been settled by the supreme court of the United States, in the case of *United States* v. *Holliday*, 3 Wall. 407.   This court has studied with great care and attention the decision of the able and learned Justice Miller, who declared the opinion of the court in that case, and the facts, material facts, are so different, as to take the case out of the condition of a precedent, applicable to the case now under consideration.   In the case of Holliday, Otibsko, to whom Holliday sold liquor, was a Chippewa Indian.   He was a member of a tribe under the care of an agent, authorized by congress, under treaty stipulations with that tribe and the United States.   How different the facts in this case: 1. The pueblo of Cochiti has never had any treaty with the United States. 2. No act of the executive or political department of the government has ever authorized any agent to be appointed for the pueblo of Cochiti.   3. A treaty with a sister republic made the people of the pueblo of Cochiti, citizens of the United States.   Had there been no treaty with the United States and the Chippewas; had there been no agent over them, and no annuity received by them; and had Otibsko been made a citizen, not of the state of Michigan, but of the United States, by treaty with Mexico; and had it

been shown that Otibsko lived on his own land, granted to his father's father by a foreign grant in 1689, and confirmed to him by the congress of the United States; and that Holliday sold him a quart of liquor at his own house on his own farm, the opinion of Justice Miller would have been that it was no violation of the United States laws, for Holliday to sell liquor to a citizen of the United States on his own farm in a sovereign state.

It has already been shown that the people of Cochiti are a corporate body, and that a full and ample remedy is given them to protect and defend their title to their individual and common lands, and that they do not need any assistance from the penal statutes of the United States to accomplish that purpose. There is a world of influence produced upon individuals and whole communities by the suggestions of a single word or sentence. You take the healthiest village in the world, where no person ever died with disease, and where a doctor had never been for half a century, and just let a neat shop be fitted up with a bay window, and big bottles with different-colored water, and then hang up a neat sign with Doctor J. Snooks, physician and surgeon, painted on it; and one third of the people will imagine that premonitory symptoms of consumption are upon them, and in less than one year, the doctor will be engaged by the year as family physician, and papa will have to drop his pen in the midst of a half-finished opinion and run for the doctor if the baby sneezes. Take the case of a peaceful community, where they have not had a lawyer or a lawsuit for half a century, and let a young lawyer put up his law books on nice shelves, hang out his sign, O. Gammon, Esq., attorney and counselor at law, and in less than six months, one half the village will have hatched up a lawsuit against the other half; and no man will pass the counselor's law office, without trying to arrange in his mind a lawsuit for the counselor. So let the Indian department have placed under their control the twenty-one pueblos of New Mexico, and get the laws of trade and intercourse, designed to regulate the commerce of the country with savages, extended over these peaceful and industrious citizens, and in less

than six months they will have fifty lawsuits on hand about questions settled by a former government fifty years ago.

The object and purpose of the eleventh section of the act of June 30, 1834, was to protect Indians in the peaceable enjoyment of lands set apart for their use by treaty with the United States; they were considered as the tenants of the government, and that the government was bound to protect them from intrusion and trespass. But does any such right or obligation exist where title is not held by treaty with the United States? By no means. The court is bound to take notice of the title of the pueblo of Cochiti, for it has been confirmed by congress in a public act as above shown. As that act has not disclosed what the title is, we must go to the public document containing a copy of that title, in order to see what it is and whence it emanated.

The following is a true copy of the original as properly translated from Spanish into English:

"1689.

"In the town of Our Lady of Guadalupe del Paso del Rio del Norte, on the twenty-fifth day of the month of September, in the year one thousand six hundred and eighty-nine:

"His Excellency Don Domingo Jerouse Petrez de Conzate, governor and captain-general, stated that: Whereas, in overlooking, in the kingdom of New Mexico, the Queres Indians, and the Apostates, and the Theguas, and those of the Thanas nation, and after having fought with all the other Indians of all the pueblos of Tia, called Bartolome de Ojedas, who distinguished himself the most in the battle, tendering his aid everywhere, and surrendered, being wounded with a bullet and an arrow; who, as aforestated, I ordered to declare under oath the condition of the pueblo of Cochiti, that apostatized and took part in the wars in the kingdom of New Mexico, as they were very rebellious Indians.

"Questioned, if the pueblo will rebel again at any future time, as it was customary with them, the deponent answered no; that they were very much intimidated; that although they were very arrogant Indians, and it was a very rebellious pueblo, but that with what had happened to

them at Tia, in the year previous, he judged that it was impossible for them to fail in yielding obedience. Questioned, if he had anything further to state in regard to the Indians concerning their rebelling and associating with the apostates, and the deponent answered no; and that it is true that it was a very rebellious pueblo, but with what had happened to them in the previous year, in the pueblo of Tia, he judged that it was impossible for them to fail in yielding obedience.

"Therefore, his Excellency Don Domingo Jerouse Petrez de Conzate, governor and captain-general, designated the boundaries as herein set forth: On the north one league; on the east one league; on the west one league, and on the south to the point of a high hill, near a stream of water running in the direction of the rising sun, and which empties into the Bravo river.

"This we owe for being rebels, and this his confession having been read and explained to him; and the deponent answered that what he had stated was the truth under the oath which he had taken, which he affirmed and ratified several times, and such being the case, he signed, wi   aid governor and captain-general, before me, the present   retary of government and war, to which I certify.

"(Signed)   DOMINGO JEROUSE PETREZ DE CO   TE.
"(Signed)   BARTOLOME DE OJEDAS."

"Before me, DON PEDRO LALLRON GAITANA."

To this letter is appended the following certificate, to wit:

"SANTA FE, NEW MEXICO, May 9, 1856.

"I, David V. Whiting, translator, certify. the foregoing to be a correct translation of the original on file in this office.

"(Signed)   DAVID V. WHITING,
"Translator."

This is the title confirmed to the pueblo of Cochiti by congress December 22, 1858. It will be manifest by reference to this title that it did not arise out of any treaty between the United States and this pueblo, nor out of any

treaty with the king of Spain, or the republic of Mexico. The title of the pueblo of Cochiti was founded in first discovery and occupancy, time whereof the memory of man runneth not to the contrary. The pueblo of Cochiti needed nothing from the king of Spain or his viceroys, nothing from the republic of Mexico or the treaty of Guadalupe Hidalgo, or acts of the American congress, to add to the validity of a title to land occupied and cultivated for three hundred years, and it is now seriously proposed to place this pueblo under the operation of laws made for savages, and which gives to the United States the right to say to these people—these citizens—get away from here, Indians; these lands are ours. It has been repeatedly decided by the supreme court that a perfect title under the laws of Spain at the time of the change of sovereignty needed no sanction from the legislative or judicial departments of the country: See *United States* v. *Wiggins*, 14 Pet. 334; *United States* v. *Kingsley*, 12 Id. 476; *Chouteau* v. *Eckhart*, 2 How. 348.

The right of property in the pueblo of Cochiti to the lands granted to them in 1689, was not affected in any manner by the change of sovereignty, as has been repeatedly settled by the supreme court, in the case of paper titles such as this: See *United States* v. *Percheman*, 7 Pet. 51; *American Insurance Company* v. *Canter*, 1 Id. 511; *Strother* v. *Lucas*, 12 Id. 410.

It will be thus seen that the title of Cochiti was a perfect title, capable of being asserted in any court; such a title as all civilized nations respect, with or without treaty, and such as all intelligent and just courts feel bound to maintain and protect. So far as that portion of the Indian intercourse act is concerned, as to the sale of liquor to Indians, the act of the tenth of January, 1853, of the legislative assembly, declared that it did not include the pueblo Indians, and congress, by not disapproving the law, assented to the exemption, and ever since that date the pueblo Indians, in common with fifty thousand other citizens of the United States, have the right to commit suicide in this pleasant, agreeable, and legal mode of self-destruction. It is not

important in this case to go into the question of the right of sale existing in the pueblos of their lands under the Spanish government, under the republic of Mexico, and as held by the decisions of the supreme court of the United States in numerous cases, for the question before us is not a question of sale, but of a penalty claimed for settlement on Indian lands.

As far back as 1571, in the reign of Philip II. of Spain, the Indians were allowed to sell their real estate and personal property in the presence of the judge; the former on thirty and the latter on nine days' notice: See Ordenanzas de Tierras y Aguas, 110. In 1642, under Phillip IV. of Spain, a total prohibition existed, and the Indians could not sell: See Id. 105. In 1781, the Indians were prohibited from selling lands without first obtaining the sanction of the supreme government: Id. 106. Over half a century ago, this identical pueblo of Cochiti sold Peña Blanca, the present county seat of Santa Ana county, and the supreme court of Guadalajara, twenty-fourth of October, 1816, annulled the sale of the Cochiti Indians to that place: See Id. 109, 110. It is proper for the court to say that the question of the validity of this sale by the Cochiti Indians of the locality where the town of Peña Blanca now is, and has been for over fifty years, was presented to the supreme government of Mexico after the separation from old Spain, and was by it confirmed. This confirmation will be found in the first volume of the Decrees of the Republic of Mexico, but as this supreme court has never been able to find but few Spanish works in the territorial library, and most of them were taken away during the occupancy of Santa Fe by the Texas forces, the court is unable to cite the page of the volume where the confirmation will be found; but the court is bound to notice that Peña Blanca has existed as a town for the last fifty years, and that the settlement is within the limits of the grant to the pueblo of Cochiti. We are also bound to notice that the proviso in the act of congress, passed twenty-second of December, 1858, reserved to the town of Peña Blanca whatever rights they had there. This question was settled by the republic of Mexico nearly half

a century past, and this court considers it as *res adjudicata;* and whether rightly or wrongly decided, this court does not pretend to decide. There must be an end of disputes some time, and after quiet acquiescence by both parties for so long a period, the question ought to be considered as at rest forever.

Let us now consider some points arising upon the face of this petition proper to be noticed if the pueblo Indians of Cochiti have been legally and rightfully stripped of their citizenship, and properly placed by the mandate, not of any treaty or law of congress, but of the commissioner of Indian affairs, under the intercourse act designed for savages.

The statute, upon which this debt of one thousand dollars is claimed to be due the United States, is in its nature penal, but the supreme court, in the case of *Taylor* v. *The United States*, 3 How. 197, decided "that statutes for the prevention of fraud, for the suppression of public wrong, or to effect a public good, are not in a strict sense penal, although they impose a penalty."

The fine in this case does not come under the above class. The penalty is found in an act to regulate trade and intercourse, and in the case of the *Mayor* v. *Davis*, 6 Watts & S. 269, it was decided, that "so far as statutes for the regulation of trade impose fines or create forfeitures, they are doubtless to be construed strictly as penal, and not literally as remedial laws."

In declaring for a penalty upon a penal statute, the case must be fully brought within the terms of the statute. The penalty is not imposed for settling upon lands secured or granted to the Indians generally; but to expose a citizen to that penalty it is required to aver in the declaration that the lands settled upon by the defendant belonged to the Indians "by treaty with the United States," and this court is of opinion that the omission of that averment renders the declaration bad on general demurrer. The court also finds that there is a fatal misdescription of the land in this case said to have been settled upon. The petition says: "Lands of the pueblo tribe of Indians of the pueblo Cochiti." Now, the title given, the title presented, and the title con-

ferred was to the "pueblo of Cochiti," without alluding in the most distant manner to their being "a tribe of Indians." We are also of opinion that it was the intention and object of this statute to protect lands consecrated to the use of Indian tribes by treaty with the United States, from an unlawful settlement or wrongful settlement, and in the petition claiming the penalty of one thousand dollars, it ought to be stated that the "settlement" which subjected the offender to so heavy a penalty was either unlawful or wrongful. The chief justice who decided this case in the court below, has passed from this life to the life to come, and as a suitable tribute of respect to an honest, good friend and true patriot, we append his opinion in the court below, in a case identical with this, as a part of our opinion in this court, which is as follows:

"In the United States district court, of the first judicial district of the territory of New Mexico.

"THE UNITED STATES
          *v.*          } Debt on Statute.
BENIGNO ORTIZ.

"Opinion. This action is brought as alleged, to recover the statutory penalty, for settlement upon lands belonging to an Indian tribe, in violation of the provisions of section 11 of the act of congress of June 30, 1834, entitled 'An act to regulate trade and intercourse with the Indian tribes and to preserve peace on the frontiers,' and commonly called the 'intercourse act,' which section is as follows:

"'Section 11. And be it further enacted, that if any person shall make a settlement on any lands, belonging, secured, or granted by treaty with the United States to any Indian tribe, or shall survey, or shall attempt to survey, such lands, or designate any of the boundaries by marking trees or otherwise, such offender shall forfeit and pay the sum of one thousand dollars.'

"The petition filed herein alleges that the defendant, at the time named therein, 'did make a settlement on, and now occupies and is settled on lands of the pueblo tribe of Indians, of the pueblo of Cochiti, said lands, then and there, and at the time of bringing this suit, belonging to the

said pueblo tribe of Indians of the pueblo of Cochiti afore-
said, and secured to them by patent from the said United
States.'

"To the petition the defendant filed a demurrer, raising
questions, not only of form, but of substance. As a ques-
tion of substance disposes of the cause, the court will not
consider those of mere form in this opinion.

"The demurrer and the argument of counsel thereon raise
the fundamental question as to whether the pueblo Indians
of the territory of New Mexico are a tribe of Indians such
as those contemplated in the intercourse act referred to,
and in the subsequent act of congress, that of February 27,
1851, which provides as follows, viz.:

"'Section 7. And be it further enacted that all the laws
now in force regulating trade and intercourse with the
Indian tribes, or such provisions of the same as may be ap-
plicable, shall be, and the same are hereby extended over
the Indian tribes in the territories of New Mexico and
Utah.'

"If the pueblo Indians are not such an 'Indian tribe' as is
contemplated in the foregoing sections, which contain all the
law upon the subject; or if the laws of the United States do
not, without violation of the letter and spirit of the constitu-
tion, and treaties of the government, recognize them as
coming within the provisions, then this action must fail.

"The court will now proceed to the consideration of this
question. In its discussion, the first question is: What
was the intention of the law-making power of the govern-
ment in enacting these laws? And what is meant by Indian
tribes therein? At the time of the passage of the inter-
course act, nearly all of the uncivilized tribes of Indians
within the then limits of the United States were within the
region described as the Indian country in the first section
of that law, viz.: 'All that part of the United States west of
the Mississippi, and not within the states of Missouri and
Louisiana or the territory of Arkansas; and also that part
of the United States east of the Mississippi river, and not
within any state to which the Indian title has not been ex-
tinguished.'

"The area referred to at that time was, with the exception of Missouri and Louisiana and the territory of Arkansas, almost entirely uninhabited by the white race, and was in the almost exclusive possession and occupancy of the savage Indian tribes of the whole country, many of which were originally there, and others of which had been removed there by the government. Within the region excluded from the description, 'Indian country,' to wit, that part of the United States peopled by the whites, and organized as states, civilized Indians were permitted to remain, and were exempt from the operations of this law. That it was the intention of the law-making power to exclude from the operations of the law the Indian tribes within the settled regions of the country is further evidenced by the fact that the states of Missouri and Louisiana and the territory of Arkansas, all lying west of the Mississippi river, were excepted, as well as the states lying east of that river.

"The intention, therefore, was manifestly to legislate with reference to Indian tribes beyond the settlements, or on the frontiers; the savage and uncivilized tribes there found, and not with reference to the civilized Indian tribes to be found within the settlements. This view is strengthened by the declaration of the title of the law, that one of its purposes was 'to preserve peace on the frontiers.' With civilized Indians, and those within the settled region of the country, no law was necessary for the preservation of peace. It was only on the frontiers that danger was to be apprehended, and for the protection of which legislation was required. If this position is correct, was the effect of the law of February 27, 1851, with reference to this region, more than to extend the provisions of the law of June 30, 1834, so far as same were applicable to the wild or savage and uncivilized Indian tribes of the territory of New Mexico? There is nothing to justify the conclusion that it was intended to extend the intercourse act over the civilized Indians, those living within the settlements of that territory. As to the applicability of these statutes to the pueblo Indians, more hereafter. .

"Now let us inquire as to the character of the pueblo In-

dians. Greenleaf on Evidence, vol. 1, c. 2, in speaking of things taken notice of by the courts without proof, says that, among other things, 'the general laws and customs of their own country, as well ecclesiastical as civil,' 'matters of public history affecting the whole people,' 'public matters affecting the government of the country,' 'of whatever ought to be generally known within the limits of their jurisdiction,' etc., the courts judicially take notice of without proof; and, 'where the memory of the judge is at fault, he resorts to such documents of reference as may be at hand, and he may deem worthy of confidence.' In the case of *United States* v. *Turner*, 11 How. 663, it is held, that the Spanish laws which prevailed in Louisiana before its cession to the United States, the courts take notice of. These rules are as good for the territory of New Mexico as elsewhere. This court is therefore justified in taking judicial notice of the past history and present condition of the pueblo Indians, as well as their status under the laws of the Mexican republic, and their present status under the laws of the United States and this territory. The court, for the attainment of the requisite information to decide this question, has consulted documents and other matters of reference worthy of confidence.

"For centuries, the pueblo Indians have lived in villages, in fixed communities, each having its own municipal or local government. As far as their history can be traced, they have been a pastoral and agricultural people, raising flocks and cultivating the soil. Since the introduction of the Spanish Catholic missionary into the country, they have mainly been taught, not only the Spanish language, but the religion of the Christian church. In every pueblo is erected a church, dedicated to the worship of God, according to the form of the Roman Catholic church, and in nearly all is to be found a priest of this church, who is recognized as their spiritual guide and adviser. They manufacture nearly all their .blankets, clothing, agricultural and culinary implements, etc. Integrity and virtue among them is fostered and encouraged. They are as intelligent as most nations or people deprived of means or facilities for education. Their names,

their customs, and their habits, are similar to those of the people in whose midst they reside, or in the midst of whom their pueblos are situated. The criminal records of the courts of the territory scarcely contain the name of a pueblo Indian. In short, they are a peaceable, industrious, intelligent, honest, and virtuous people. They are Indians only in features, complexion, and a few of their habits; in all other respects superior to all but a few of the civilized Indian tribes of the country; and the equal of the most civilized thereof. This description of the pueblo Indians, I think, will be deemed by all who know them, as faithful and true in all respects. Such was their character at the time of the acquisition of New Mexico by the United States, and such is their character now.

"Looking at the intention of congress as manifested in the intercourse act, etc., and the character of the pueblo Indians as thus presented, this court would be justified in declaring that such laws were not applicable to this people, the question of the applicability of those laws being a question addressing itself to the sound judgment and discretion of the courts. The exercise of these necessary judicial qualities impels this court, in view of the law and the facts, to declare the inapplicability of the laws referred to, to the pueblo Indians.

"Here the court might stop; other strong reasons, however, suggest themselves, stronger than logical conclusions, viz., positive law upon the subject, and time-honored acquiescence therein. The pueblo Indians, having assisted the Mexicans in throwing off the yoke of Spain, were recognized as citizens of Mexico; and as a further token of the appreciation of the people of that government of the value of their services during the revolution, they were granted the lands upon which their pueblos or villages were erected, by grant since confirmed by the government of the United States, and for which patents have issued conveying whatever of interest the United States government might have therein to them, as well as to their successors and assigns.

"The plan of Iguala, adopted by the revolutionary government of Mexico, twenty-fourth February, 1821, declares,

that all the inhabitants of new Spain, without distinction, whether Europeans, Africans, or Indians, are citizens of this monarchy, with a right to · be employed in any post according to their merit and virtues,' and that ' the person and property of every citizen will be respected by the government.' The treaty of Cordova, twenty-fourth August, 1821, and the declaration of independence of twenty-eighth September, 1821, reaffirmed these principles, as subsequently did the first Mexican congress, by two decrees, one adopted twenty-fourth of February, 1822, the other ninth of April, 1823. The first, ' the sovereign congress declares the equality of civil rights to all the free inhabitants of the empire, whatever may be their origin in the four quarters of the earth;' the other reaffirms the three guarantees of the plan of Iguala: 1. Independence; 2. The Catholic religion; and 3. Union of all Mexicans of whatever race. By an act of September 17, 1822, to give effect to the plan of Iguala, it was provided that ' in the registration of citizens, classification of them with regard to their origin shall be omitted,' and that there shall be no distinction of class on the parochial books. Upon the subject of citizenship of Mexico of the Indian races, in the case in the supreme court of *The United States* v. *Ritchie,* Justice Nelson, who delivered the opinion of the court, says: ' These solemn declarations of the political power of the government had the effect necessarily to invest the Indian with the privileges of citizenship as effectually as had the declaration of independence of the United States of 1776, to invest all those persons with these privileges residing in the country at the time, and who adhered to the interests of the colonies,' and refers to 3 Pet. 99, 121.

"That the pueblo Indians were declared at that time ' Mexicans ' and citizens; that they were recognized as such, no one familiar with the history of the Mexican government can question. That they are still recognized as citizens of the republic of Mexico is evidenced by the fact that the present president of that republic is a full-blood pueblo Indian. Did they retain the character and description of ' Mexicans ' or citizens, at the time of the acquisi-

tion of New Mexico? It is true that subsequently qualifications were annexed to the exercise of the right of suffrage; the freedom of many of the citizens of the republic of Mexico was abridged and narrowed; but I can not find that by any legislation or judicial decisions the character of 'Mexicans' or citizens was taken away from the pueblo Indians as a class of people.

"The robbery of our territorial library during the late rebellion, of its Spanish and Mexican authorities, renders it difficult to obtain definite information upon the subject; but this we know, that as late as the year 1851, the pueblo Indians of this territory, without question or interruption, not only voted, but held both civil and military offices. In many localities, they, by their numerical strength, controlled the political destinies of the same. This period (1851) was more than two years after the treaty of peace between the United States and Mexico, and the erection of a government under the United States over the people of the territory. In the absence of law or decision on the subject, are we not at liberty to conclude from these facts that the laws, the decisions of the courts, and the acquiescence of the people, all recognized the pueblo Indians as citizens, as 'Mexicans'? We do so conclude.

"Now, if the pueblo Indians were 'Mexicans,' or citizens of the republic of Mexico, what effect has the treaty of Guadalupe Hidalgo upon their present status? The federal constitution declares: 'All treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land.' As such, the executive, the legislative, and the judicial branches of the government are all alike bound by all treaties so made. The treaty of Guadalupe Hidalgo, made the second of February, 1848, declares, that Mexicans, 'who shall prefer to remain in the said territories (including New Mexico), may either retain the title and rights of Mexican citizens or acquire those of citizens of the United States; but they shall be under the obligation to make their election within one year from the date of the exchange of ratifications of this treaty; and those who shall remain in the said territories, after the expiration of that

year, without having declared their intention to retain the character of Mexicans, shall be considered to have elected to become citizens of the United States.'

"Again, if the pueblo Indians were Mexicans, or citizens of the United Mexican States at that time, and did not, within the time limited, make their election by declaring their intention to retain the character of Mexicans, they became, by virtue of the said treaty, citizens of the United States. · The history of the times and country shows that they did not so elect, and thereby they became invested by law with the rights and privileges, and entitled to the title of citizens of the United States. They, although still called Indians, have never, since the acquisition of this territory, been subject to such legislation as that authorized by the constitution, and found in the intercourse act of congress. They should be treated, not as under the privilege of the government, but as citizens, not of a state or territory, but of the United States of America.

"It has been argued that, because the secretary of the interior, the commissioner of Indian affairs, etc., have considered the pueblo Indians as tribal Indians, and not citizens, by sending an agent to them; and that under the authority of the decision, in the case of *United States* v. *Holliday*, 3 Wall. 407, this court is estopped by such action of the departments, etc., from the adjudication of the question. This position would be true if the pueblo Indians were such Indian tribes as is contemplated in the acts of congress, under the constitutional authority, to regulate commerce 'with the Indian tribes.'

"That agents have been sent to them by the representatives of the government argues nothing, unless it argues ignorance of the status of this people, or as an intention on the part of the government simply to become advised with reference to them, and to assist them by the direction of their energies and intelligence to a higher degree of civilization or perhaps enlightenment. As they own their homes, are christianized, and are entirely self-sustaining, an agent for them is little else than what we have described.

"It is proper to add that the people of this territory who

are most familiar with the pueblo Indians, have recognized their capacity and character by passing a general act of incorporation of their pueblos enabling them to sue and be sued in their corporate name, etc. This is more striking when we consider the fact that none of the other cities, towns, or villages of the territory have been incorporated.

"The federal constitution guarantees to all citizens the same privileges and immunities and protection to life, liberty, and property. These rights are as much guaranteed to pueblo Indians as to any other class of citizens of the United States."

The novelty and magnitude of the question involved, and the large number of persons interested in its solution appearing to require the most careful consideration of this cause, the court has endeavored to perform what it believed to be its duty in the premises.

The demurrer is sustained. The decision of the court below in this case is now affirmed by the supreme court:

The United States, Plaintiff in Error.     }     Debt on Statute.
*v.*
Jose Juan Lucero.

This cause having been submitted to the court on argument of counsel and briefs filed herein, and the court being sufficiently advised in the premises, affirm the decision of the district court for the first judicial district, at Santa Fe, territory of New Mexico, and order that the costs herein be taxed against the plaintiff in error.