## UNITED STATES *v.* SANDOVAL.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW MEXICO.

No. 352. Argued February 27, 1913.—Decided October 20, 1913.

Congress has power to make conditions in an Enabling Act, and require the State to assent thereto, as to such subjects as are within the regulating power of Congress. *Coyle* v. *Oklahoma,* 221 U. S. 559, 574.

Such legislation, when it derives its force not from the resulting compact but solely from the power of Congress over the subject, does not operate to restrict the legislative power of the State in respect to any matter not plainly within the regulating power of Congress. *Coyle* v. *Oklahoma,* 221 U. S. 559, distinguished.

The status of the Pueblo Indians in New Mexico and their lands is such that Congress can competently prohibit the introduction of intoxicating liquors into such lands notwithstanding the admission of New Mexico to statehood.

The power and duty of the United States under the Constitution to regulate commerce with the Indian tribes includes the duty to care for and protect all dependent Indian communities within its borders, whether within its original limits or territory subsequently acquired and whether within or without the limits of a State. *United States* v. *Kagama,* 118 U. S. 375.

Congress may not bring a community or body of people within range of its power by arbitrarily calling them Indians; but in respect of distinctly Indian communities the questions whether and for how long they shall be recognized as requiring protection of the United States are to be determined by Congress and not by the courts.

In reference to all political matters relating to Indians it is the rule of this court to follow the executive and other political departments of the Government whose more special duty it is to determine such affairs. If they recognize certain people as a tribe of Indians, this court must do the same.

*Quære*, and not decided, whether the Pueblo Indians of New Mexico are citizens of the United States.

The fact that Indians are citizens is not an 'obstacle to the exercise by Congress of its power to enact laws for the benefit and protection of tribal Indians as a dependent people.

Congress has power to exclude liquor from the lands of the Pueblo Indians, for although the Indians have a fee simple title, it is communal, no individual owning any separate tract. *United States* v. *Joseph*, 94 U. S. 614, distinguished.

It was a legitimate exercise of power on the part of Congress to provide in the Enabling Act under which New Mexico was admitted as a State against the introduction of liquor into the Indian country and the prohibition extends to lands owned by the Pueblo Indians in New Mexico.

198 Fed. Rep. 539, reversed.

THE facts, which involve the validity, as applied to the Pueblo Indians of New Mexico, of the act of January 30, 1897, as supplemented by the Enabling Act of June 20, 1910, in regard to the introduction of intoxicating liquor into Indian country and the status of the Pueblo Indians. of New Mexico, are stated in the opinion.

*Mr. Solicitor General Bullitt*, with whom *Mr. Louis G. Bissell* was on the brief, for the United States:

Congress had the power in admitting New Mexico to statehood to impose conditions relative to the Pueblo Indians within its borders.

Conditions imposed by Congress upon new States

through their enabling acts are valid when they result from the exercise of powers conferred upon the Federal Government. *Coyle* v. *Oklahoma,* 221 U. S. 559.

The Federal power over Indians is of this character. *Coyle* v. *Oklahoma,* 221 U. S. 559; *United States* v. *43 Gallons of Whiskey,* 93 U. S. 188; *Ex parte Webb,* 225 U. S. 663.

This power permits prohibitions against the sale of intoxicants to the Indian wards of the United States, its introduction upon Indian lands and the exemption of such lands from state taxation. *Choate* v. *Trapp,* 224 U. S. 665; *The Kansas Indians,* 5 Wall. 737; *United States* v. *Dick,* 208 U. S. 340; *United States* v. *Holliday,* 3 Wall. 407; *United States* v. *43 Gallons of Whiskey,* 93 U. S. 188; *United States* v. *Rickert,* 188 U. S. 432.

The Pueblo Indians of New Mexico are Indians and, therefore, subject to the constitutional power of Congress over Indians.

Federal jurisdiction cannot be excluded merely by implication. *Hallowell* v. *United States,* 221 U. S. 317; *United States* v. *Celestine,* 215 U. S. 278.

Federal jurisdiction over the Pueblo Indians was not precluded or ousted by any of their four essential characteristics. Their organization in villages is consistent with Federal jurisdiction. Pueblo Indians are tribal Indians within the true meaning of the words "Indian Tribes" in the "Commerce Clause."

As to the meaning of "Indian Tribes" see Articles of Confederation, Art. IX; 1 Story, Const. (1873), §§ 1097–98; Farrand, Records of Const. Conv. Form of Pueblo Indian organization; Report by Bandelier to Archeol. Inst. of Amer.; Report No. 23—Bureau of Amer. Ethnology, pages cited.

There is a presumption in favor of jurisdiction. *Dartmouth College* v. *Woodward,* 4 Wheat. 518; Willoughby, Constitution, § 150; 1 Kappler, Indian Laws and Treaties, p. 880.

Federal jurisdiction also arises by implication from the Indians' need of governmental protection. *Heckman* v. *United States*, 224 U. S. 413; *Tiger* v. *Western Investment Co.*, 221 U. S. 286; *United States* v. *Celestine*, 215 U. S. 278; *United States* v. *Kagama*, 118 U. S. 375.

The Pueblo Indians require protection. They were wards of Spanish and Mexican governments under Spanish laws. Report by Bandelier, *supra; Sunol* v. *Hepburn*, 1 California, 254; *United States* v. *Pico*, 5 Wall. 536; *United States* v. *Ritchie*, 17 How. 575.

Authorities cited in opposition to Federal jurisdiction: *United States* v. *Joseph*, 94 U. S. 614; *United States* v. *Lucero*, 1 New Mex. 422; *United States* v. *Santistevan*, 1 New Mex. 583, involved construction of a statute only and not the present paramount reason for exercise of Federal jurisdiction over Indians, i. e., protection of Indians. *Worcester* v. *Georgia*, 6 Pet. 515; *Matter of Heff*, 197 U. S. 488; *Jones* v. *Meehan*, 175 U. S. 10; *Rainbow* v. *Young*, 161 Fed. Rep. 830; *United States* v. *Kagama*, 118 U. S. 375; *United States* v. *Rickert*, 188 U. S. 432.

Their civilization is not inconsistent with their wardship. Report of Bandelier, *supra.*

Their citizenship is consistent with their wardship. The Pueblo Indians were citizens of New Mexico. *United States* v. *Ritchie*, 17 How. 525.

Citizens may well be wards of the Government. *Bowling* v. *United States*, 191 Fed. Rep. 22; *Hallowell* v. *United States*, 221 U. S. 317; *Rainbow* v. *Young*, 161 Fed. Rep. 835; *United States* v. *Celestine*, 215 U. S. 278; *United States* v. *Logan*, 105 Fed. Rep. 240; *United States* v. *Sutton*, 215 U. S. 291.

The relinquishment of Federal jurisdiction is a political question. *Hallowell* v. *United States*, 221 U. S. 317; *Heckman* v. *United States*, 224 U. S. 413; *Matter of Heff*, 197 U. S. 488; *Lone Wolf* v. *Hitchcock*, 185 U. S. 555; *Tiger* v. *Western Imp. Co.*, 221 U. S. 317; *United States* v.

*Celestine*, 215 U. S. 278; *United States* v. *Holliday*, 3 Wall. 407.

The ownership of lands in fee by Indian Pueblos is consistent with wardship; Pueblo ownership in fee is ownership in common. *United States* v. *Joseph*, 94 U. S. 614; 10 Stat. 308; 11 Stat. 374.

Federal governmental power over Indians does not depend upon property rights or title. *Heckman* v. *United States*, 224 U. S. 413; *Peters* v. *Malin*, 111 Fed. Rep. 244; *United States* v. *Allen*, 179 Fed. Rep. 13; *United States* v. *Rickert*, 188 U. S. 432.

The affirmative evidence of guardianship relation between United States and Pueblo Indians appears in appropriations made for farming implements, teachers, agents and an attorney. 10 Stat. 315, 330; 11 Stat. 169; 18 Stat. 146; 22 Stat. 83; 30 Stat. 571, 594.

The presumption against pure gratuities implies the wardship of the Indian beneficiaries. *Allen* v. *Smith*, 173 U. S. 389; *United States* v. *Realty Co.*, 163 U. S. 427.

Decisions by the territorial courts for New Mexico, denying the wardship of the Pueblo Indians, have immediately been nullified by Congress. *Territory* v. *Delinquent Taxpayers*, 12 New Mex. 139, 33 Stat. 1048, 1069; *United States* v. *Mares*, 14 New Mex. 1; Enabling Act, 36 Stat. 558.

Assertion of jurisdiction in the Enabling Act. The power of Congress was not previously lost because unsurrendered to a State. *Matter of Heff*, 197 U. S. 488; *United States* v. *Sutton*, 215 U. S. 291; *Wiggan* v. *Connelly*, 163 U. S. 56.

The real interests of the Pueblo Indians require Federal supervision to the extent to which it was asserted in the Enabling Act for New Mexico.

*Mr. A. B. Renehan* for defendant in error:

The Indians known as "Pueblo Indians" are not

Indians in the contemplation of the Indian Intercourse Act, but are citizens of the United States and of the State of New Mexico.

It is clear from a careful study of the Spanish laws that the Indians, meaning the Pueblo Indians, as distinct from the "savages" or "Indios Barbaros," were entitled, under the law, to own and control property both real and personal, and, subject to certain restrictions, could sell and dispose of the same.

Under the Spanish rule the Pueblo Indians were on an equality with European Spaniards and entitled to all the rights of European Spaniards, subject, however, to certain restrictions upon their rights of alienation of property.

Under the Mexican Government the Pueblo Indians were full fledged citizens upon an equality with all other citizens of the Mexican republic.

Being citizens of the Mexican republic at the date of the treaty of Guadalupe Hidalgo, they became citizens of the United States, with all the rights, privileges and immunities of such citizenship. *United States* v. *Ritchie,* 17 How. 525; *United States* v. *Joseph,* 94 U. S. 614; *United States* v. *Lucero,* 1 New Mex. 422; *United States* v. *Joseph,* 1 New Mex. 593; *United States* v. *Santistevan,* 1 New Mex. 583; *United States* v. *Mares,* 14 New Mex. 1; *Pueblo Indian Tax Cases,* 12 New Mex. 139; *De La O* v. *Pueblo of Acoma,* 1 New Mex. 226.

The lands of the Pueblo Indians are not such lands as are known as Indian country, but are held by them in fee simple, segregated from the public domain, free from all conditions. They are not, and never have been, held in trust by the Federal Government.

The Pueblo Indians are not, and never have been, wards of the Federal Government, nor are they under the charge of any Indian superintendent or agent.

The Pueblos are not Indians over whom the Govern-

ment, through its departments, has ever exercised, or now exercises, guardianship.

While there were certain restrictions upon the right of the Pueblo Indians to sell their property in real estate, under the Spanish regime, these restrictions were entirely removed under the Mexican Government. The Pueblos held their lands, with all the rights of alienation, by a fee simple title at the date of the treaty of Guadalupe Hidalgo.

Their title was fully recognized by the United States Government, all claims of the Government having been quitclaimed to the Pueblo Indians in 1858.

The provisions of the Enabling Act of June 20, 1910, and of the constitution of the State of New Mexico, attempting to bring the Pueblo Indians and their lands within the terms of the Intercourse Act are a nullity.

The Pueblo Indians, prior to the passage of the Enabling Act, were not within the provisions of the act of January 30, 1897, 29 Stat. 506. They were not wards of the Government; they were not in charge of any agent; their lands were not held in trust by the Government, nor did the Government exercise any rights of guardianship over them, nor had the Government ever negotiated any treaty with them as an Indian tribe.

The congressional power to legislate for the Indians flows from one of five sources: 1st, The treaty-making power; 2d, The power to regulate interstate commerce; 3d, The power to regulate commerce with Indian tribes; 4th, The ownership as sovereign of lands to which the Indian title has not been extinguished; 5th, The plenary authority arising out of the Nation's guardianship of the Indians as an alien but dependent people. *United States Express Company* v. *Friedman*, 191 Fed. Rep. 673. See also *United States* v. *Boss*, 160 Fed. Rep. 132.

None of these apply to the Pueblo Indians of New Mexico.

Although Congress has at various times legislated in

behalf of the Pueblo Indians within the Territory of New Mexico, these congressional acts cannot be said to make them wards of the National Government. Rather, they are mere gratuities given by the Federal Government to a certain class of citizens residing within a Territory. See *United States Express Co.* v. *Friedman*, 191 Fed. Rep. 673, 680; *Moshier* v. *United States*, 198 Fed. Rep. 54; *Matter of Heff*, 197 U. S. 488; *Keller* v. *United States*, 213 U. S. 147; *Ward* v. *Racehorse*, 163 U. S. 504 and cases cited; *Coyle* v. *Oklahoma*, 221 U. S. 559.

The Federal Government never had any title to these lands. By the treaty of Guadalupe Hidalgo the Pueblos had been fully recognized as citizens of the United States, and yet by the provisions of the Enabling Act, without the consent of the individual citizen, Congress seeks to deprive them of the rights and privileges of national, and therefore state, citizenship.

There is no power conferred by the Constitution of the United States upon the United States authorizing it to undertake to regulate, manage and control private property and the administration of private property in any one of the States. Such matters are left to the State and its legislative bodies alone.

The Federal Government, in creating a new State, cannot arbitrarily segregate out of the State privately owned lands to which the United States has no title or claim whatsoever, and say that these lands shall be subject to the laws of the United States.

The power which Congress attempted to exercise in § 2 of the Enabling Act of June 20, 1910, so far as it affects the Pueblo Indians, must be traced to some definite constitutional authority in order to sustain it. It cannot emanate from any of the sources referred to in the case of *United States Express Company* v. *Friedman*. In fact neither that case nor any of the later cases relied on by the plaintiff in error hold that Congress has power to

carve out of a new State privately owned lands and say, that while they are within the new State for certain purposes, for other purposes they shall be subject to Federal control. See *Coyle* v. *Oklahoma*, 221 U. S. 559.

Congress cannot deprive a newly admitted State or any State, by a compact declared to be irrevocable, of its right to regulate its own internal police affairs. *Keller* v. *United States*, 213 U. S. 147; *Ward* v. *Race Horse*, 163 U. S. 504.

If Congress had no power to impose these restrictions upon New Mexico, the State of New Mexico had no right to surrender any of the powers which are expressly reserved to the States by the Federal Constitution. *Coyle* v. *Smith, supra; Permoli* v. *First Municipality*, 3 How. 589; *Pollard's Lessee* v. *Hagan*, 3 How. 212; *Texas* v. *White*, 7 Wall. 700; *Ward* v. *Race Horse*, 163 U. S. 504.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is a criminal prosecution for introducing intoxicating liquor into the Indian country, to wit, the Santa Clara pueblo, in the State of New Mexico. In the District Court a demurrer to the indictment was sustained and the indictment dismissed upon the theory that the statute upon which it is founded is invalid, as applied to Indian pueblos in New Mexico, because usurping a part of the police power of the State and encroaching upon its equal footing with the other States. 198 Fed. Rep. 539.

The indictment is founded upon the act of January 30, 1897, 29 Stat. 506, c. 109, as supplemented by § 2 of the act of June 20, 1910, 36 Stat. 557, c. 310, being the New Mexico Enabling Act. The first act makes it a punishable offense to introduce intoxicating liquor into the Indian country, and the second, in naming the conditions upon which New Mexico should be admitted into the Union,

prescribed,[1] in substance, that the lands then owned or occupied by the Pueblo Indians should be deemed and treated as Indian country within the meaning of the first act and of kindred legislation by Congress.

---

[1] The pertinent portions of the Enabling Act are:

SEC. 2. That . . . the said convention shall be, and is hereby, authorized to form a constitution and provide for a state government for said proposed State, all in the manner and under the conditions contained in this Act. . . .

"And said convention shall provide, by an ordinance irrevocable without the consent of the United States and the people of said State—

"First. That . . . the sale, barter or giving of intoxicating liquors to Indians and *the introduction of liquors into Indian country, which term shall also include all lands now owned or occupied by the Pueblo Indians of New Mexico, are forever prohibited.*

"Second. That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title . . . to all lands lying within said boundaries owned or held by any Indian or Indian tribes the right or title to which shall have been acquired through or from the United States *or any prior sovereignty,* and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States; . . . but nothing herein, or in the ordinance herein provided for, shall preclude the said State from taxing, as other lands and other property are taxed, any lands and other property outside of an Indian reservation owned or held by any Indian, save and except such lands as have been granted or acquired as aforesaid or as may be granted or confirmed to any Indian or Indians under any Act of Congress, but said ordinance shall provide that all such lands shall be exempt from taxation by said State so long and to such extent as Congress has prescribed or may hereafter prescribe . . .

"Eighth. That whenever hereafter any of the lands contained within Indian reservations or allotments in said proposed State shall be allotted, sold, reserved, or otherwise disposed of, they shall be subject for a period of twenty-five years after such allotment, sale, reservation, or other disposal to *all the laws of the United States prohibiting the introduction of liquor into the Indian country; and the terms "Indian" and "Indian country" shall include the Pueblo Indians of New Mexico and the lands now owned or occupied by them."*

Whether without this legislative interpretation the first act would have included the pueblo lands we need not consider. The Territorial Supreme Court had but recently held that it did not include them (*United States* v. *Mares*, 14 New Mex. 1), and Congress, evidently wishing to make sure of a different result in the future, expressly declared that it should include them. That this was done in the Enabling Act and that the State was required to, and did, assent to it, as a condition to admission into the Union, in no wise affects the force of the congressional declaration, if only the subject be within the regulating power of Congress. As was said by this court in *Coyle* v. *Oklahoma*, 221 U. S. 559, 574: "It may well happen that Congress should embrace in an enactment introducing a new State into the Union, legislation intended as a regulation of commerce among the States, or with Indian tribes situated within the limits of such new State, or regulations touching the sole care and disposition of the public lands or reservations therein, which might be upheld as legislation within the sphere of the plain power of Congress. But in every such case such legislation would derive its force not from any agreement or compact with the proposed new State, nor by reason of its acceptance of such enactment as a term of admission, but solely because the power of Congress extended to the subject, and, therefore, would not operate to restrict the State's legislative power in respect of any matter which was not plainly within the regulating power of Congress." To the same effect are *Pollard* v. *Hagan*, 3 How. 212, 224–225, 229; *Ex parte Webb*, 225 U. S. 663, 683, 690–691.

The question to be considered, then, is, whether the status of the Pueblo Indians and their lands is such that Congress competently can prohibit the introduction of intoxicating liquor into those lands notwithstanding the admission of New Mexico to statehood.

There are as many as twenty Indian pueblos scattered

over the State, having an aggregate population of over 8,000. The lands belonging to the several pueblos vary in quantity, but usually embrace about 17,000 acres, held in communal, fee simple ownership under grants from the King of Spain made during the Spanish sovereignty and confirmed by Congress since the acquisition of that territory by the United States. 10 Stat. 308, c. 103, § 8; 11 Stat. 374, c. 5. As respects six of the pueblos, one being the Santa Clara, adjacent public lands have been reserved by executive orders for the use and occupancy of the Indians.

The people of the pueblos, although sedentary rather than nomadic in their inclinations, and disposed to peace and industry, are nevertheless Indians in race, customs, and domestic government. Always living in separate and isolated communities, adhering to primitive modes of life, largely influenced by superstition and fetichism, and chiefly governed according to the crude customs inherited from their ancestors, they are essentially a simple, uninformed and inferior people. Upon the termination of the Spanish sovereignty they were given enlarged political and civil rights by Mexico, but it remains an open question whether they have become citizens of the United States. See treaty of Guadalupe Hidalgo, Articles VIII and IX, 9 Stat. 922, 929; *United States* v. *Joseph,* 94 U. S. 614, 618; *Elk* v. *Wilkins,* 112 U. S. 94. Be this as it may, they have been regarded and treated by the United States as requiring special consideration and protection, like other Indian communities. Thus,[1] public moneys have been expended in presenting them with farming implements and utensils;

---

[1] See, *inter alia,* 10 Stat. 330, c. 167; 17 Stat. 165, c. 233; 18 Stat. 147, c. 389; 21 Stat. 130, c. 85; 22 Stat. 83, c. 163; 26 Stat. 337, 355, c. 807; 30 Stat. 594, c. 545; 36 Stat. 278, c. 140; Reports Com'r Indian Affairs, 1907, p. 58; 1908, p. 55; 1909, p. 48; 1 Kappler, 878, 880; Executive Orders relating to Indian Reservations (1912), 124–127, 129–130.

and in their civilization and instruction; agents and super-
intendents have been provided to guard their interests;
central training schools and day schools at the pueblos
have been established and maintained for the education of
their children; dams and irrigation works have been con-
structed to encourage and enable them to cultivate their
lands and sustain themselves; public lands, as before in-
dicated, have been reserved for their use and occupancy
where their own lands were deemed inadequate; a special
attorney has been employed since 1898, at an annual
cost of $2,000, to represent them and maintain their
rights; and when latterly the Territory undertook to
tax their lands and other property, Congress forbade such
taxation, saying: "That the lands now held by the various
villages or pueblos of Pueblo Indians, or by individual
members thereof, within Pueblo reservations or lands, in
the Territory of New Mexico, and all personal property
furnished said Indians by the United States, or used in
cultivating said lands, and any cattle and sheep now
possessed or that may hereafter be acquired by said In-
dians, shall be free and exempt from taxation of any sort
whatsoever, including taxes heretofore levied, if any,
until Congress shall otherwise provide." 33 Stat. 1048,
1069, c. 1479. An exempting provision was also inserted
in § 2 of the Enabling Act.

The local estimate of this people is reflected by a New
Mexico statute adopted in 1854 and carried into subse-
quent compilations, whereby they were "excluded from
the privilege of voting at the popular elections of the
Territory" other than the election of overseers of ditches
in which they were interested and the election of the of-
ficers of their pueblos "according to their ancient cus-
toms." Laws 1853–4, p. 142, § 3; Comp. Laws 1897,
§ 1678.

With one accord the reports of the superintendents
charged with guarding their interests show that they are

dependent upon the fostering care and protection of the Government, like reservation Indians in general; that, although industrially superior, they are intellectually and morally inferior to many of them; and that they are easy victims to the evils and debasing influence of intoxicants. We extract the following from published reports of the superintendents:

*Albuquerque*, 1904: "While a few of these Pueblo Indians are ready for citizenship and have indicated the same by their energy and willingness to accept service from the railroad companies and elsewhere, and by accepting the benefits of schools and churches, a large per cent. of them are unable, and not yet enough advanced along the lines of civilization, to take upon themselves the burden of citizenship. It is my opinion that in the event taxation is imposed it will be but a short time before the masses of the New Mexico Pueblo Indians will become paupers. Their lands will be sold for taxes, the whites and Mexicans will have possession of their ancient grants, and the Government will be compelled to support them or witness their extermination."

*Santa Fe*, 1904: "The Pueblo have little or no money, and they cannot understand why they should be singled out from all other Indians and be compelled to bear burdens [Territorial taxes] which they are not able to assume. . . . They will not vote, nor are they sufficiently well informed to do so intelligently."

*Zuni*, 1904: "Last November when they had their Shaleco dance I determined to put a stop to the drunkenness. I wrote to the Indian Office asking for a detachment from Fort Wingate. I soon received a reply that my request had been granted. I said nothing to anyone. The afternoon the Shaleco arrived the detachment rode in, the Indians thinking they were passing through, and were making preparations to have a good time. When they were notified that a Navaho was celebrating, they

promptly arrested him and brought him over to the guard-house, and during the evening two others were arrested with whiskey in their possession, and also a Pueblo Indian. The detachment remained until the dance was over and the visiting Indians had left for their homes."

*Santa Fe*, 1905: "Until the old customs and Indian practices are broken among this people we cannot hope for a great amount of progress. The secret dance, from which all whites are excluded, is perhaps one of the greatest evils. What goes on at this time I will not attempt to say, but I firmly believe that it is little less than a ribald system of debauchery. The Catholic clergy is unable to put a stop to this evil, and know as little of same as others. The United States mails are not permitted to pass through the streets of the pueblos when one of these dances is in session; travelers are met on the outskirts of the pueblo and escorted at a safe distance around. The time must come when the Pueblos must give up these old pagan customs and become citizens in fact."

*Santa Fe*, 1906: "There is a greater desire among the Pueblo to live apart and be independent and have nothing to do with the white race than among any other Indians with whom I have worked. They really care nothing for schools, and only patronize them to please their agent and incidentally to get the issues given out by the teacher. The children, however, make desirable pupils, and if they could be retained in school long enough more might be accomplished. The return student going back to the pueblo has a harder task before him than any other class of returned students, I know. It is easier to go back to the Sioux tepee and lead a white man's life than to go back to the pueblo and retain the customs and manners taught in the school.

"In pueblo life the one-man domination—the fear of the wrath of the governor of the pueblo—is what holds this people down. The rules of the pueblo are so strict that

the individual cannot sow his wheat, plant his corn, or harvest same in the autumn without the permission of the pueblo authorities. The pueblos under my jurisdiction that adhere religiously to old customs and rules are Taos, Picuris, Santo Domingo, and Jemez, tho there are none of them that have made much progress away from the ancient and pagan rites.

"Intemperance is the besetting sin of the Pueblo. . . . If the law against selling intoxicants to this simple and ignorant people is allowed to stand as now interpreted [Act of 1897 as construed by Territorial court], it simply means the ultimate extermination of the Pueblo and the survival of the fittest."

*Santa Fe,* 1909: "While apparently the Pueblo Indians are law-abiding, it has come to my notice during the past year that in the practice of the Pueblo form of government cruel and inhuman punishment is often inflicted. I have strongly advised the Indians against this, and your office has, through me, done likewise. The Pueblos, however, are very insistent upon retaining their ancient form of government. As long as they are permitted to live a communal life and exercise their ancient form of government, just so long will there be ignorant and wild Indians to civilize. The Pueblo form of government recognizes no other form of government and no other authority. While apparently they submit to the laws of the Territory and the government, they do so simply because they are compelled to acquiesce. The returned student who has been five years at the boarding school is compelled to adopt the Indian dress upon his return to the pueblo; he is compelled to submit to all the ancient and heathen customs of his people. If he rebels he is punished. He therefore lapses back and becomes like one who has never seen the inside of a school."

*Zuni,* 1909: "The Zunis, especially the old people, are very much opposed to sending their children to school and

to every influence that tends to draw them away from their old ways and habits of living; but by persistent effort, and by appealing to their reason, we succeeded in filling the school with children. The children are happy and contented while at school, but when they go home for a visit, their mothers and older sisters talk with them and make them dissatisfied and they do not wish to return. This is especially true of the girls. . . . Immorality and a general laxness in regard to their family relations, together with their Pagan practices, are the great curse of this tribe. They have no marriage ceremony that is binding, and a man will often live with two or three different women during one year. This custom is very demoralizing. In some cases the father will sell his daughters and the husband his wife for the purpose of prostitution. If marriage and divorce laws could be enforced, it would be a great blessing to these people. . . . We have had very little trouble with liquor on the reservation during the past year, and the Pueblo officers coöperate with me in trying to keep it from being brought on the reservation."

This view of Pueblo customs, government and civilization finds strong corroboration in the writings of ethnologists, such as Bandelier and Stevenson, who, in prosecuting their work, have lived among the Pueblos and closely observed them. Papers Arch. Inst. Am. Ser. Vol. 3, part 1 (1890); Bureau Am. Ethn. Reports, Vols. 11 (1889–'90) and 23 (1901–'02).

During the Spanish dominion the Indians of the pueblos were treated as wards requiring special protection, were subjected to restraints and official supervision in the alienation of their property, and were the beneficiaries of a law declaring "that in the places and pueblos of the Indians no wine shall enter, nor shall it be sold to them." *Chouteau* v. *Molony*, 16 How. 203, 237, Laws of the Indies, Book 6, title 1, laws 27 and 36, title 2, law 1; Book 5,

title 2, law 7; Book 4, title 12, laws 7, 9, 16–20; Cedulas and Decrees shown in Hall's Mexican Law, §§ 162–171. After the Mexican succession they were elevated to citizenship and civil rights not before enjoyed, but whether the prior tutelage and restrictions were wholly terminated has been the subject of differing opinions. *United States* v. *Pico*, 5 Wall. 536, 540; *Sunol* v. *Hepburn*, 1 California, 255, 279–280, 291–292; 1 Nuevo Febrero Mexicano, pp. 24–25; Hall's Mexican Laws, § 161; *United States* v. *Ritchie*, 17 How. 525, 540. In the last case this court observed: "The improvement of the Indians, under the influence of the missionary establishments in New Spain, which had been specially encouraged and protected by the mother country, had, doubtless, qualified them in a measure for the enjoyment of the benefits of the new institutions. In some parts of the country very considerable advancement had been made in civilizing and christianizing the race. From their degraded condition, however, and ignorance generally, the privileges extended to them in the administration of the government must have been limited; and they still, doubtless, required its fostering care and protection." And in the *Pico Case* the court, referring to the status of an Indian pueblo and its inhabitants during the Mexican regime, said: "The disposition of the lands assigned was subject at all times to the control of the government of the country. The pueblo of Las Flores was an Indian pueblo, and over the inhabitants the government extended a special guardianship."

But it is not necessary to dwell specially upon the legal status of this people under either Spanish or Mexican rule, for whether Indian communities within the limits of the United States may be subjected to its guardianship and protection as dependent wards turns upon other considerations. See *Pollard* v. *Hagan*, 3 How. 212, 225. Not only does the Constitution expressly authorize Congress to regulate commerce with the Indian tribes, but

long continued legislative and executive usage and an
unbroken current of judicial decisions have attributed to
the United States as a superior and civilized nation the
power and the duty of exercising a fostering care and pro-
tection over all dependent Indian communities within
its borders, whether within its original territory or terri-
tory subsequently acquired, and whether within or with-
out the limits of a State. As was said by this court in
*United States* v. *Kagama*, 118 U. S. 375, 384: "The power
of the General Government over these remnants of a race
once powerful, now weak and diminished in numbers, is
necessary to their protection, as well as to the safety of
those among whom they dwell. It must exist in that
government, because it never has existed anywhere else,
because the theatre of its exercise is within the geograph-
ical limits of the United States, because it has never
been denied, and because it alone can enforce its laws on
all the tribes." In *Tiger* v. *Western Investment Co.*, 221
U. S. 286, 315, prior decisions were carefully reviewed and
it was further said: "Taking these decisions together, it
may be taken as the settled doctrine of this court that
Congress, in pursuance of the long-established policy of
the Government, has a right to determine for itself when
the guardianship which has been maintained over the
Indian shall cease. It is for that body, and not for the
courts, to determine when the true interests of the Indian
require his release from such condition of tutelage."

Of course, it is not meant by this that Congress may
bring a community or body of people within the range
of this power by arbitrarily calling them an Indian tribe,
but only that in respect of distinctly Indian communi-
ties the questions whether, to what extent, and for what
time they shall be recognized and dealt with as dependent
tribes requiring the guardianship and protection of the
United States are to be determined by Congress, and not
by the courts. *United States* v. *Holliday*, 3 Wall. 407, 419;

*United States* v. *Rickert*, 188 U. S. 432, 443, 445; *Matter of Heff*, 197 U. S. 488, 499; *Tiger* v. *Western Investment Co.,* *supra.*

As before indicated, by an uniform course of action beginning as early as 1854 and continued up to the present time, the legislative and executive branches of the Government have regarded and treated the Pueblos of New Mexico as dependent communities entitled to its aid and protection, like other Indian tribes, and, considering their Indian lineage, isolated and communal life, primitive customs and limited civilization, this assertion of guardianship over them cannot be said to be arbitrary but must be regarded as both authorized and controlling. As was said in *United States* v. *Holliday, supra:* "In reference to all matters of this kind, it is the rule of this court to follow the executive and other political departments of the Government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same. If they are a tribe of Indians, then, by the Constitution of the United States, they are placed, for certain purposes, within the control of the laws of Congress. This control extends, as we have already shown, to the subject of regulating the liquor traffic with them. This power residing in Congress, that body is necessarily supreme in its exercise." In that case the Congressional enactment prohibiting the sale of liquor to Indian wards and forbidding its introduction into the Indian country was applied to a sale in the State of Michigan to an Indian who had and exercised the right to vote under the laws of the State, and other applications of the statute to Indians and Indian lands in other States are shown in *United States* v. *43 Gallons of Whiskey*, 93 U. S. 188, 197; *Dick* v. *United States*, 208 U. S. 340; *United States* v. *Sutton*, 215 U. S. 291; *Hallowell* v. *United States*, 221 U. S. 317; *United States* v. *Wright*, 229 U. S. 226.

It is said that such legislation cannot be made to em-

brace the Pueblos, because they are citizens. As before stated, whether they are citizens is an open question, and we need not determine it now, because citizenship is not in itself an obstacle to the exercise by Congress of its power to enact laws for the benefit and protection of tribal Indians as a dependent people. *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 308; *United States* v. *Rickert*, 188 U. S. 432, 445; *United States* v. *Celestine*, 215 U. S. 278, 290; *Hallowell* v. *United States, supra*.

It also is said that such legislation cannot be made to include the lands of the Pueblos, because the Indians have a fee simple title. It is true that the Indians of each pueblo do have such a title to all the lands connected therewith, excepting such as are occupied under executive orders, but it is a communal title, no individual owning any separate tract. In other words, the lands are public lands of the pueblo, and so the situation is essentially the same as it was with the Five Civilized Tribes, whose lands, although owned in fee under patents from the United States, were adjudged subject to the legislation of Congress enacted in the exercise of the Government's guardianship over those tribes and their affairs. *Stephens* v. *Cherokee Nation*, 174 U. S. 445, 488; *Cherokee Nation* v. *Hitchcock, supra; Heckman* v. *United States*, 224 U. S. 413; *Gritts* v. *Fisher, id.* 640; *United States* v. *Wright, supra*. Considering the reasons which underlie the authority of Congress to prohibit the introduction of liquor into the Indian country at all, it seems plain that this authority is sufficiently comprehensive to enable Congress to apply the prohibition to the lands of the Pueblos.

We are not unmindful that in *United States* v. *Joseph*, 94 U. S. 614, there are some observations not in accord with what is here said of these Indians, but as that case did not turn upon the power of Congress over them or their property, but upon the interpretation and purpose of a statute not nearly so comprehensive as the legislation

now before us, and as the observations there made respecting the Pueblos were evidently based upon statements in the opinion of the territorial court, then under review, which are at variance with other recognized sources of information, now available, and with the long-continued action of the legislative and executive departments, that case cannot be regarded as holding that these Indians or their lands are beyond the range of Congressional power under the Constitution.

Being a legitimate exercise of that power, the legislation in question does not encroach upon the police power of the State or disturb the principle of equality among the States. *United States* v. *Holliday, United States* v. *43 Gallons of Whiskey, United States* v. *Kagama, Hallowell* v. *United States* and *Ex parte Webb, supra.*

The judgment is accordingly reversed, with directions to overrule the demurrer to the indictment and to proceed to the disposition of the case in regular course.

*Reversed.*