**UNITED STATES of America in Behalf of the PUEBLO OF SAN ILDE- FONSO, Plaintiff,**

v.

**Harley BREWER and Mrs. Harley Brewer, Defendants.**

**Civ. No. 4368.**

United States District Court
D. New Mexico.

June 24, 1960.

James A. Borland, U. S. Atty., William A. Brophy, Albuquerque, N. M., Herbert A. Holt, Asst. U. S. Atty., Albuquerque, N. M., for plaintiff.

M. W. Hamilton, Santa Fe, N. M., for defendants.

ROGERS, District Judge.

In this action, the United States of America in behalf of the Pueblo of San Ildefonso, seeks a decree of this Court requiring the defendants, non-members of the San Ildefonso Indian Pueblo to deliver to the Pueblo of San Ildefonso, the sole and exclusive possession of a tract of land, approximating .485 acres within the perimeter thereof, and a decree restraining and prohibiting the defendants from further trespass thereon.

In their answer, the defendants admit that they are in actual possession of the lands described in the complaint. They state that they have erected upon the lands certain improvements, including buildings and appurtenances, but deny that they have no right thereon, and deny that the improvements were erected unlawfully. Defendants also claim they were erected under permit and license from the Pueblo of San Ildefonso.

For affirmative defenses, they state that their son, Frank Brewer, married Tonita Pino, the daughter of Agapito Pino and Lydia Pino; that the three Pinos were members of the Pueblo of San Ildefonso and that the land referred to was land allotted to the three Pinos under

the customs and laws of the Pueblo. Further, that in March, 1953, Frank Brewer, Tonita Pino Brewer, Agapito Pino and Lydia Pino authorized and requested the defendants to build their home and reside on the lands herein in dispute, and that they were given a life estate on the land, the land to revert to Harley Frank Brewer, the son of William Frank Brewer and Tonita Pino Brewer, and in the event of his death, to the youngest daughter of that pair.

The defendants, in their second affirmative defense, state that if they are ejected from the land and their improvements forfeited to the Pueblo of San Ildefonso, it will constitute the taking of the property of the defendants without due process of law, contrary to the provisions of the Constitution of the United States; and for a third affirmative defense, that the forfeiture will constitute an unjust enrichment of the Pueblo, without authority of law and without due process of law, contrary to the constitution and laws of the State of New Mexico.

A pre-trial conference was had in this cause, and among the issues delineated to be tried on a trial on the merits, are these:

1. What title did Tonita Pino Brewer have in the premises, and what right, if any, did she have to enter into the aforementioned agreement with the defendants, binding the Pueblo of San Ildefonso?

2. Is the doctrine of hardship a defense in this case?

3. Is the doctrine of unjust enrichment a defense in this action?

The Pueblo of San Ildefonso is located approximately 22 miles northwest of Santa Fe, New Mexico. The land grant given the Pueblo by the Crown of Spain was confirmed on December 22, 1858 (11 Stat. 374). The patent to the San Ildefonso Land Grant was executed on November 1, 1864. No reservations were included in the patent, other than that of "royal minerals", that is, gold and silver. For details on this phase of the case, see Memoir No. 70 of the American Anthropologists at page 78, The Pueblo Indians of New Mexico, Their Lands, Economy and Civil Organization by S. D. Aberle.

The acreage of the entire grant is 15,413.48 acres, and the population of the Pueblo at all times material hereto, is approximately 253. In the Pueblo are two plazas, one near the South portion thereof, and the second in the North. In the 1940's, factional difficulties resulted in a split among the tribe, and the members thereof aligned themselves with either the North or the South faction. Each faction elected a Governor and a Lieutenant Governor, and in addition thereto, a Council of 13 men was chosen in a manner which the witnesses at the trial declared was a religious secret, and was not revealed. Suffice it to say, there were two governments of the Pueblo.

As a result of this factional upheaval, the Bureau of Indian Affairs of the Department of Interior of the Federal Government refused to recognize either faction, and no recognized government existed on the Pueblo until approximately the year 1957. In 1958, the integrated government, which covered the entire Pueblo, was recognized by the Bureau of Indian Affairs.

Neither of the defendants, as is above stated, was or is a member of the San Ildefonso tribe. Their son, William Frank Brewer, married Tonita Pino in 1942. He went on the land and lived with his wife there beginning in the year 1943. The couple had four children and were divorced in 1945. They began living together without the benefit of a new marriage, in 1946, and continued this relationship until 1958.

The defendants, at the invitation of the Pinos and Frank Brewer, moved onto the Pueblo in 1953, and over a period of years, built a home near the South Plaza, which the Government appraised at approximately $9,000. The only paper title, if it can be called "title", is a document in the nature of a testamentary disposition, wherein Agapito Pino and Delubina Tafoya granted to Tonita Pino, as party

of the second part, and to her heirs, executors and administrators, as the case may be, a tract of land situated at the south side of the Pueblo, in former years belonging to Juan Vigil, with exits and entrances and appurtenances free from trespassing upon the neighbors, for which said persons signed the testament in front of two witnesses. At no time was the consent of the Secretary of the Interior, or any of his agents, obtained for the defendants to live on the land, or to erect any improvements thereon.

The Court deems it advisable to outline the law of the Kingdom of Spain, of Mexico and of the United States relative to Indian land grants, and the power of alienation, if any, of the members of a Pueblo in New Mexico, relative to lands within an Indian land grant. A very lucid discussion of land policies of Spain and Mexico and the United States, relative to the Pueblo Indians of New Mexico, appears on pages 17 to 31 of Pueblo land grants of the "Rio Abajo, New Mexico" by Herbert O. Brayer in the University of New Mexico Bulletin (1939). While the author is not of the legal profession, he was very thorough in his research, and his conclusions appear to have authority from a historical, statutory and case law standpoint. He relies, as to Spanish Codification, upon Recopilacion de las Leyes de Los Reynos de las Indias (Madrid, 1791), Lib. 6; documents from New Mexico archives and many historical works by Spanish and American historians.

In summarizing the policy of the Spanish Government relative to the lands of the Pueblo Indians of New Mexico, Brayer concludes as follows:

1. The Pueblo Indians of New Mexico were considered wards of the Spanish Crown.

2. The fundamental legal basis for the Pueblo Land Grants lies in the Royal Ordinances.

3. Only the Viceroy, Governors and Captains-General could make grants to the Indians, and only these officials had the authority to validate sales of land by the Indians.

4. All non-Indians were expressly forbidden to reside upon the Pueblo lands.

5. The Spanish Government provided legal advice, protection and defense for the Indians. Provincial officials had the authority to appeal cases directly to the Audiencias in Mexico.

6. The Indians had prior water rights to all streams, rivers and other waters which crossed or bordered their lands.

7. The Pueblo Indians had their land in common, the land being granted to the Indians in the name of the Pueblo.

The Mexican Government secured its independence from the Crown of Spain in 1821, and from that date until the American Conquest in 1846, the Pueblos were under the jurisdiction of Mexico. See United States v. Lucero, 1 N.M. 422. Brayer summarized the Indian land policy of the Mexican Government essentially as follows:

1. The Pueblo Indians of New Mexico were still considered wards of the Government, even though given the title of citizens.

2. Only the most important of the Governmental officials could authorize the sale of Indian lands. The same local officials in this land continued the exercise of the same powers as they had during the Spanish regime, and this continued throughout the entire period of Mexican Sovereignty.

3. The Spanish Laws enforced prior to 1821, relating to Indian lands and land policies, remained in full force.

4. There was a laxity on the part of the local officials which resulted in a large number if non-Indians obtaining holdings on Indian lands. This problem was left to the United States after 1846.

5. The title to Pueblo lands remained in the name of the individual Pueblos, and no individual Indian held title to any portion thereof.

Brayer probably over-simplifies the policy of the United States since 1846, as regards the Pueblo Indians of New

Mexico, but the three features which he does set forth include the following:

1. The Pueblo Indians of New Mexico are wards of the United States.

2. The Indians have a communal title to their lands originally granted by Spain, recognized by Mexico and confirmed by the United States.

3. As wards of the United States, the Indians may not alienate their lands without the consent of the Government.

The best text on the land policies of Spain and Mexico and the United States, is Handbook of Federal Indian Law by Felix Cohen, U. S. Government Printing Office, 1942, Chapter 20, "Pueblos of New Mexico". Another lucid discussion appears in Federal Indian Law, published by the U. S. Department of the Interior, U. S. Government Printing Office, Washington, 1958, Chapter 11, pages 889 to 927.

Supreme Court of the United States cases relative to Indian Pueblos include United States v. Joseph, 94 U.S. 614, 24 L.Ed. 295; United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 and United States v. Candelaria, 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023. These cases were evaluated by the author of this opinion in the case of State of New Mexico ex rel. State Highway Commission v. United States and the Pueblo of Laguna, D. C., 148 F.Supp. 508.

█ █ Under the law as formulated by the Supreme Court of the United States, it is now settled that the Congress of the United States is vested with the power, within constitutional limits, to govern the rights of Indians in the United States (U. S. Constitution, Article I, Sec. 8, Clause 3). The Indians, as such, have no power of alienation of Indian land, except to the United States, since the fee of such lands is in the United States, subject only to the right of occupancy. To acquire title in Indian lands, the title of both the Indian Pueblo and of the United States must be acquired within the ambit of Congressional enactment.

On June 7, 1924, the Congress of the United States enacted an Act, the same being Chapter 331, 43 Stat. 636, which is set forth in Title 25 U.S.C.A. § 331 note. Section 17 thereof, is, in the opinion of the Court, dispositive of the case at Bar. It provides as follows:

"No right, title or interest in or to the lands of the Pueblo Indians of New Mexico to which their title has not been extinguished as hereinbefore determined shall hereafter be acquired or initiated by virtue of the laws of the State of New Mexico, or in any other manner except as may hereafter be provided by Congress, and no sale, grant, lease of any character, or other conveyance of lands, or any title or claim thereto, made by any Pueblo as a community, or any Pueblo Indian living in a community of Pueblo Indians, in the State of New Mexico, shall be of any validity in law or equity unless the same be first approved by the Secretary of the Interior."

This statute is still in effect, and Congress has not, since June of 1924, enacted any legislation which would validate any attempted conveyance by an Indian Pueblo or an individual member thereof, without the consent or approval by the Secretary of Interior.

In the instant case, there is no evidence of approval by the Secretary of Interior, the Bureau of Indian Affairs or any of its agents.

█ Estoppel will not work against the Federal Government in a factual situation such as here presented, nor does the Doctrine of Unjust Enrichment apply in the absence of Congressional legislation. It is true that the defendants have erected improvements which the Indian Department appraisers state is of a value of $9,000. Defendants have lived on the land, rent free and tax free, for over seven years. They were volunteers in erecting these improvements. As is above shown, no title was acquired by the defendants from the Pueblo of San Ildefonso. Agreement or approval was

not secured from the Secretary of Interior, and hence we do not have a situation analogous to exercise of eminent domain by the United States of America.

The tract of land on which the improvements were erected, is communal land of the Pueblo of San Ildefonso, and all of the parties hereto were cognizant of that fact. The Court, however, does not desire to be precipitous in evicting the defendants, who are apparently of high character, and have not violated any of the Laws of the Pueblo, or of the United States, and it is accordingly decided that the defendants will have six (6) months from the date of the evicting decree within which to move from the Pueblo, and the defendants are granted leave to take so much of the improvements and the building materials with them as they may be able so to do.

A decree in conformity with this opinion will be submitted on or before June 30, 1960.