Austin J. TOBIN, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16604.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 6, 1962.

Decided June 7, 1962.

Petition for Rehearing En Banc
Denied July 2, 1962.
Certiorari Denied Nov. 13, 1962.
See 83 S.Ct. 206.

Mr. Thomas E. Dewey, New York City, with whom Messrs. Everett I. Willis, Lino A. Graglia and Sidney Goldstein, New York City, were on the brief, for appellant.

Mr. William Hitz, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Nathan J. Paulson, Asst. U. S. Atty., were on the brief, for appellee. Mr. Charles T. Duncan, Principal Asst. U. S. Atty., also entered an appearance for appellee.

Mr. Daniel M. Cohen, New York City, of the bar of the Court of Appeals of New York, *pro hac vice*, by special leave of court, with whom Mr. Jerome M. Alper, Washington, D. C., was on the brief,

for State of New York, as *amicus curiae*, urging reversal.

Mr. Theodore I. Botter, Trenton, N. J., of the bar of the Supreme Court of New Jersey, *pro hac vice*, by special leave of court, for State of New Jersey as *amicus curiae*. Mr. William F. Tompkins, Newark, N. J., was on the brief for State of New Jersey, as *amicus curiae*, urging reversal.

Mr. J. Raymond Clark, Philadelphia, Pa., filed a brief on behalf of the New York Chamber of Commerce, as *amicus curiae*, urging reversal.

Mr. Jerome M. Alper, Washington, D. C., filed a brief on behalf of the State of Delaware, as *amicus curiae*, urging reversal.

Mr. Jerome M. Alper, Washington, D. C., filed a brief on behalf of the State of Alabama, and others, as *amici curiae*, urging reversal.

Before WILBUR K. MILLER, Chief Judge, and DANAHER and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

Austin J. Tobin, the Executive Director of the Port of New York Authority, was charged by information and convicted in the District Court of criminal contempt of Congress, under 2 U.S.C.A. § 192, for refusing to produce certain documents called for by a subpoena issued by Subcommittee No. 5 of the Committee on the Judiciary of the United States House of Representatives.

The Port of New York Authority is a bi-state agency established in 1921 and 1922 by compacts between the States of New York and New Jersey to provide for the efficient administration of the New York harbor, which is divided geographically between the two states. Pursuant to the compact clause of the Constitution,[1] Congress consented to the compacts but expressly retained, among other matters, "the right to alter, amend or repeal" its resolutions of approval. Over the years, the Port Authority has been remarkably successful in achieving its goals. As of 1959, it had investments of nearly one billion dollars and gross annual operating revenue in excess of one hundred million dollars.

In February of 1960, the Judiciary Committee initiated an investigation of the Authority on an informal basis. The Authority cooperated with the Committee investigators except as to disclosing certain documents alleged to relate exclusively to the internal administration of the Authority. After this refusal events moved swiftly to a climax.

On June 1, 1960, the Chairman of the Committee obtained from the House subpoena power in connection with matters "involving the activities and operations of interstate compacts." What little floor discussion there was preceding this grant of subpoena power was not very enlightening; it certainly provided no lucid analysis of what was soon to follow. On June 8, 1960, Subcommittee No. 5 of the Judiciary Committee instituted a formal inquiry into the Authority.

Appellant conferred with the Board of Commissioners of the Authority, as well as with the Governors of both New York and New Jersey, and the consensus of their opinion was that the investigation being attempted was too broad to be valid. The Subcommittee was informed of their objections and the reasons therefor. Discounting these objections, the Subcommittee issued the subpoena in question. Appellant requested postponement of the return date of the subpoena in order to give the Governors an opportunity to meet with the Subcommittee and discuss their objections but the Subcommittee refused the postponement.

After being denied the opportunity to appear before the Subcommittee, the Governors wrote identical letters to their respective representatives on the Board of Commissioners of the Authority, in-

---

1. Article I, Section 10, cl. 3, of the Constitution reads in pertinent part: "No State shall, without the Consent of Congress * * * enter into any Agreement or Compact with another State * * *."

structing them to direct appellant not to comply with the subpoena. The Board of Commissioners so directed appellant on June 27, 1960. Two days later, on June 29, 1960, the Subcommittee met to receive the return of the subpoena. It was against this background that appellant refused to comply with the demands of the subpoena[2] and was ruled in default by the Chairman of the Subcommittee. Thereafter, the Subcommittee recommended to the full Committee that appellant be cited by the House for contempt. This recommendation was adopted by the Judiciary Committee, two members dissenting, and subsequently by the House itself. Charged by information, appellant waived his right to jury trial and was convicted of contempt of Congress by District Judge Youngdahl.[3]

Appellant advances several arguments in support of the position that his conviction cannot stand. For present purposes, to illustrate the constitutional issues we would have to decide in order to affirm the conviction, we list but two of his arguments:

1. That Congress does not have the power, under the compact clause of the Constitution, to "alter, amend or repeal" its consent to an interstate compact, which was the stated purpose of the Subcommittee's investigation.

2. That "the subpoena issued by the Subcommittee, demanding documents relating to the internal administration of the Port Authority which the Governors of New York and New Jersey ordered appellant not to produce, [was] an unconstitutional invasion of powers reserved to the States under the Tenth Amendment to the Constitution."

Because of the view we take of this case, appellant's first contention demands some elaboration. In granting its consent Congress can attach certain binding conditions, not only to its consent to the admission of a new state into the Union,[4] but also to its consent to the formation of an interstate compact.[5] However, the vital condition precedent to the validity of any such attached condition is that it be constitutional. If Con-

---

2. Appellant's refusal to comply with the subpoena was only partial. The subpoena as issued is reported here in its entirety, the bracketed portions representing those documents actually produced, the unbracketed portions representing those that were refused:

"(1) [All by-laws, organization manuals, rules and regulations;]

"(2) [Annual financial reports;] internal financial reports, including budgetary analyses, post-closing trial balances, and internal audits; and management and financial reports prepared by outside consultants;

"(3) All agenda [and minutes] of meetings of the Board of Commissioners and of its committees; all reports to the Commissioners by members of the executive staff;

"(4) All communications in the files of the Port of New York Authority and in the files of any of its officers or employees including correspondence, interoffice and other memoranda and reports relating to:

"(a) the negotiation, execution and performance of construction contracts; ne-

gotiation, execution and performance of insurance contracts, policies and arrangements; and negotiation, execution and performance of public relations contracts, policies and arrangements;

"(b) the acquisition, transfer and leasing of real estate;

"(c) the negotiation and issuance of revenue bonds;

"(d) the policies of the Authority with respect to the development of rail transportation."

The demands of the subpoena encompassed the period from January 1, 1946, to June 15, 1960.

3. For a scholarly analysis of the factual setting of this case, we refer to the detailed delineation found in the opinion of District Judge Youngdahl, 195 F.Supp. 588 (1961).

4. United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913).

5. Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959).

gress does not have the power under the Constitution, then it cannot confer such power upon itself by way of a legislative fiat imposed as a condition to the granting of its consent.[6]

In the present case, therefore, Congress's express reservation of the right "to alter, amend or repeal" its initial consent to the creation of the Authority is meaningless unless Congress has the power under the Constitution "to alter, amend or repeal" its consent to an interstate compact. The compact clause of the Constitution does not specifically confer such power upon Congress. No case has been cited to us, nor have we been able to find any case through our own research, holding that Congress has such constitutional power. Nor do we find any to the contrary. Since no such power appears expressly in the compact clause, any holding that it exists and that Congress possesses it must be predicated on the conclusion that it exists as an implied power.

We have addressed ourselves at some length to this issue in order to show the gravity of passing upon even only one of the constitutional questions posed by this case. Moreover, in view of appellant's argument that the plenary powers specified in and by the Constitution are more than sufficient to enable Congress to protect, supervise and preserve all federal interests affected by the existence of interstate compacts, we are even less inclined to reach the constitutional issues involved here. We have no way of knowing what ramifications would result from a holding that Congress has the implied constitutional power "to alter, amend or repeal" its consent to an interstate compact. Certainly, in view of the number and variety of interstate compacts in effect today, such a holding would stir up an air of uncertainty in those areas of our national life presently affected by the existence of these compacts. No doubt the suspicion of even potential impermanency would be damaging to the very concept of interstate compacts.

Appellant argues that congressional consent becomes irrevocable once it is given under the compact clause since Congress thereby removes the constitutional ban against the formation of interstate compacts and thus, to that extent, restores the states to the inherent sovereignty they enjoyed prior to the adoption of the Constitution. This does not mean that once congressional consent is obtained the particular compact becomes a law unto itself, immune by reason of its autonomy from future congressional supervision. It simply means that the states are restored to that much of their original sovereignty as would permit them to enter into compacts with each other. To this extent, and to this extent alone, does congressional consent restore them to sovereignty—sovereign in the narrow sense of being free to conclude an interstate compact, not sovereign in the broad sense of being free of the Constitution.

Accordingly, if a particular compact happens to be operational in nature (as exemplified by the compact creating the Authority) as opposed to one static in nature (as exemplified by an agreement to settle a disputed boundary line, an *act* which necessarily dies at the moment of its birth), Congress is not without power to control the conduct of the former. Under our system of government the Constitution is paramount, and the Constitution gives to Congress certain plenary powers, as for example those in the field of interstate commerce and that of national defense. With the choice of acting pursuant to any or all of these plenary powers continuously available to it, Congress has at its disposal abundant authority to supervise and regulate the activities of operational compacts in such a way as to insure that no violence is done by these compacts to more compelling federal concerns.

Appellant argues, in short, that Congress can adequately protect every interest that needs such protection because of the existence of an operational compact without, in doing so, being forced

6. Cf. Coyle v. Smith, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911).

to the extremity of rescinding its consent under the compact clause, an action which appellant contends Congress has no constitutional power to perform.

Appellant's assertion in this respect is not unpersuasive, since a holding that Congress has the constitutional power to "alter, amend or repeal" its consent under the compact clause can hardly be stated as a proposition of universal applicability. A line marking the boundary between two states, initially drawn by such states acting pursuant to an interstate compact, could hardly be erased at some later date by Congress's enactment of hindsight legislation purporting to repeal its consent to the compact by which such boundary was initially determined. See the discussion in Hinderlider v. LaPlata River Co., 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202 (1938) and cases cited therein.

In other words, appellant seeks to distinguish the ways in which congressional control over an operational compact may be properly exercised: he argues that control undertaken pursuant to the plenary powers is licit, whereas control attempted in the sense of withdrawing consent under the compact clause is illicit.

Lest this distinction be looked upon as nothing more than a quibble, a mere academic distinction of a nicety too refined to be noticed outside an ivory tower, it must be remembered that this case comes to us by way of a criminal conviction.[7] It must be borne in mind, therefore, that appellant is entitled to all of the safeguards which our system of criminal jurisprudence assures him, not the least of which is that he not be convicted in a general rush to vindicate matters actually collateral to the crime for which he stands accused. Indeed, the present case is a classic example of how this very danger arises.

Appellant is no criminal and no one seriously considers him one. He stands before us convicted of crime merely because no method has been provided for testing the merits of his contentions save that of a prosecution for contempt of Congress. It is truly unfortunate that his choice was so restricted as to the presentation of his case, for it places us in the posture of being asked to answer broad questions of civil law within the framework of reviewing a criminal conviction. Undoubtedly the questions presented to us properly demand resolution, but we should not and cannot permit this appeal for answers to blind us to our duty of administering criminal justice according to traditional concepts. It must be remembered that what we decide in this case will be precedent for another, and far too often has the rashness of today begotten the regrets of tomorrow to induce us to tread unsanctioned by-ways of criminal adjudication merely because the setting of a particular appeal suggests the expediency of such a course. In short, we decide this case as we would any other criminal appeal. It is with these considerations in mind, therefore, that we approach the disposition of the present controversy.

 A contempt of Congress prosecution is not the most practical method of inducing courts to answer broad questions broadly. Especially is this so when the answers sought necessarily demand far-reaching constitutional adjudications. To avoid such constitutional holdings is our duty, particularly in the area of the right of Congress to inform itself. United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953). Consequently, when Congress authorizes a committee to conduct an investigation, the courts have adopted the policy of construing such resolutions of authority

7. Regardless of what Congress *might* have done or how Congress *might* have approached the instant problem, we are bound by what Congress in fact *did* do. Since the jurisdiction of the Subcommittee that issued the subpoena in question is derived from the compact clause, and since the stated purpose of the Subcommittee's investigation was to determine whether Congress should "alter, amend, or repeal" its consent to the compacts that established the Authority, the distinction under discussion not only is not a play on words—it is an essential dividing line between appellant's guilt or innocence of criminal conduct.

narrowly, in order to obviate the necessity of passing on serious constitutional questions. Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); Brewster v. United States, 103 U.S.App.D.C. 147, 255 F.2d 899, cert. denied, 358 U.S. 842, 79 S.Ct. 51, 3 L.Ed.2d 77 (1958).

■ Accordingly, the first issue we must decide is whether Congress gave the Judiciary Committee of the House (and therefore its Subcommittee No. 5) authority sufficient to permit the Subcommittee to conduct the sweeping investigation undertaken in the instant case. The authority pointed to as validating the present investigation was conferred by the House upon the Judiciary Committee in piecemeal fashion:

The Legislative Reorganization Act of 1946 granted to the Judiciary Committee authority over nineteen subjects, including "interstate compacts generally." 60 Stat. 812, 826–827; Rule XI (1). In 1959 the Committee was given subpoena power to conduct "full and complete investigations and studies relating to [certain stated matters] coming within the jurisdiction of the Committee." H.R. Res. 27, 86th Cong., 1st Sess. (1959). As this last grant of authority did not encompass interstate compacts, it was amended on June 1, 1960, to include "the activities and operations of interstate compacts." H.R.Res. 530, 86th Cong., 2d Sess. (1960). Putting these resolutions of authority together, we find that the Committee was given jurisdiction over "interstate compacts generally," and the power "to conduct full and complete investigations and studies relating to * * the activities and operations of interstate compacts."

The authority thus granted to the Committee is couched in general terms. In the present case, the Committee stretched these general terms in order to justify about as specific an investigation of the Port of New York Authority as can be envisaged. We are inclined to believe the House did not intend these general terms to be stretched quite so far. While it is true that the Judiciary Committee for many years did have specific jurisdiction over "interstate compacts generally," its traditional activity with respect to this jurisdiction was entirely foreign to an investigation of the kind and scope attempted here. So in this respect the present case is the antithesis of the Supreme Court's decision in Barenblatt,[8] where the particular committee's authorization was found in the long history of congressional acquiescence in that committee's work.

In the present case, the very fact that Congress had never before attempted such an expansive investigation of an interstate compact agency—an investigation, by its very nature, sure to provoke the serious and difficult constitutional questions involved here—leads to the conclusion that if Congress had intended the Judiciary Committee to conduct such a novel investigation it would have spelled out this intention in words more explicit than the general terms found in the authorizing resolutions under consideration.[9] In any event, general terms are usually susceptible of differing interpretations. And so, in view of the fact that we consider it our duty to avoid, if possible, constitutional adjudication, we read these authorizing resolutions to mean that the Judiciary Committee was empowered to conduct an investigation

---

8. Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959).

9. In arriving at our conclusion in this respect, we have been particularly impressed by the absence of any truly enlightening or informative floor discussion in Congress at the time the instant authority was sought by and granted to the Judiciary Committee concerning the use in depth that was expected to be made of it. This want of explanation is especially striking in light of the fact that no such massive investigation of a compact agency had ever been initiated by Congress before. We think the respect to which Congress is legitimately entitled supports the conclusion that it would not signal its approval of a decision of such magnitude in the delicate area of Federal-State relationship without a clearer expression of its understanding of what it was doing than is reflected by the instant case.

calling for documents relating to *actual* "activities and operations" of the Authority rather than for all of the administrative communications, internal memoranda, and other intra-Authority documents demanded by the subpoena in question. Brewster v. United States, supra. Cf. United States v. Rumely, supra. And see United States v. Kamin, 136 F.Supp. 791 (Mass.1956). Therefore, we think the Subcommittee's investigative authority, as thus construed, was exhausted by the information actually tendered by appellant in compliance with the subpoena, for such information adequately disclosed all that the Authority had done in the areas under inquiry. The information refused to the Subcommittee related only to the *why* of Authority activity and, consequently, was outside the scope of the Subcommittee's authority to investigate.[10]

We feel inclined to add a few words in conclusion. If Congress should adopt a resolution which in express terms authorizes and empowers the Committee and its duly authorized Subcommittee to initiate an investigation of the Port of New York Authority as deep and as penetrating as the one attempted here, a challenge of the congressional power so to provide would of course present constitutional issues which we should have to meet and decide. Therefore, we emphasize that all we are saying here is that a due regard for the responsibility of administering justice prompts us to avoid serious constitutional adjudications until such time as Congress clearly manifests its intention of putting such a decisional burden upon us.

Especially do we say this in view of the unusual nature of the present case, where we are asked to decide essentially civil and jurisdictional issues at the same time that we establish criminal precedent. The conflicting duality inherent in a request of this nature is not particularly conducive to the giving of any satisfactory answer, no matter what the answer should prove to be. Should this controversy be resumed, it is hoped that Congress will first give sympathetic consideration to Judge Youngdahl's eloquent plea:

"During the House debate on the contempt citation, the Committee inserted in the *Congressional Record* a memorandum purporting to show that declaratory judgment procedures were not an available means for procuring judicial resolution of the basic issues in dispute in this case. Although this question is not before the Court, it does feel that if contempt is, indeed, the only existing method, Congress should consider creating a method of allowing these issues to be settled by declaratory judgment. Even though it may be constitutional to put a man to guessing how a court will rule on difficult questions like those raised in good faith in this suit, what is constitutional is not necessarily most desirable. Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights. Moreover, to raise these issues in the context of a contempt case is to force the courts to decide many questions that are not really relevant to the underlying problem of accommodating the interest of two sovereigns." 195 F.Supp. at 616–617.

Reversed.

---

10. That the power of a subcommittee having general jurisdiction over a subject must nonetheless be specifically spelled out in particular instances has been made abundantly clear in many expressions by the Supreme Court. The contempt of Congress cases, in whatever posture the problem be posed, underscore this thought. [See for example Russell v. United States, 82 S.Ct. 1038, and related cases, decided by the Supreme Court May 21, 1962]. Basically the proposition may be simply stated. There can be no "constructive" offenses. United States v. Resnick, 299 U.S. 207, 210, 57 S.Ct. 126, 81 L.Ed. 127 (1936).